# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA CITY DIVISION

331 PARTNERS, LLC,
a Georgia Limited Liability Company,

      Plaintiff,

v.                                        Case No.: 3:23-cv-24769-TKW-ZCB

331 FREEPORT PARTNERS, LLC,
a Florida Limited Liability Company,

      Defendant.

_____/

## DEFENDANT 331 FREEPORT PARTNERS, LLC
## MOTION FOR SUMMARY JUDGMENT

Defendant, 331 Freeport Partners, LLC ("Freeport" or "Seller"), by and through their undersigned counsel, pursuant to Federal Rule of Civil Procedure 56, hereby files its Motion for Summary Judgment. There are no genuine issues of material fact in dispute and summary judgment is due to be granted in Freeport's favor.

## INTRODUCTION

Freeport is a single purpose entity created to purchase and develop or sell real estate along Highway 331 in Freeport, Florida. A portion totaling approximately 1,089 acres of that real estate (the "Property") was the subject of a purported Vacant Land Contract, with its attachments, between Freeport and the Plaintiff, 331

Partners, LLC ("Partners" or "Buyer"). The alleged contract was executed by the parties on July 6, 2021. ECF No. 42-1 - Vacant Land Contract with Attachments.[1] The purported contract consists of a Florida Realtors' standardized form Vacant Land Contract ("VLC"), Exhibit "A" titled Additional Terms and Conditions, Exhibit "B" titled Legal Description of Property, and Exhibit "C" titled Escrow Agent Acceptance and Agreement of Escrow Agent. Exhibit A contains most of the controlling terms of the agreement.

Following the execution of the agreement, Partners was to have an inspection period which was the later date of 120 days from execution or "date on which [Partners] receives the Approvals, as hereinafter defined…" The term "Approvals" included approvals from the City of the Master Development Plan "together with city-approved concurrency availability," i.e. vest water/sewer rights, and an approved Developer's Agreement, referred to together as the "City Approval". The alleged contract specified that One Hundred Fifty (150) days after the effective date, Freeport had the right to determine in its reasonable discretion that if "(i) the City Approval is not available within the next ninety (90) days or will not be obtainable by the parties after diligent application, or (ii) water/sewer availability is not available or obtainable by the parties for the Property… then Freeport may elect to

---

[1] A redacted copy is being filed with this Motion pursuant to Plaintiff's Motion to File Unredacted Contract. The Unredacted Copy is being submitted by Plaintiff under seal.

require Partners to make its determination within the Inspection Period whether to proceed with the Agreement… or to terminate the Agreement." Freeport retained the right to approve submissions to the City, including requiring that no materially adverse modifications could be made to the entitlements.

The alleged contract contemplated that Partners would diligently work to obtain Approvals and water/sewer availability. Partners set forth a timeline on July 30, 2021 of expected developments regarding the Property, including a pre-application for rezoning the land, followed by a rezoning, then a Property Development Project ("PDP") amendment. However, following that, Partners and Freeport had very little contact for almost two (2) years and Partners failed to follow through on any of the required steps to obtain the Approvals.

On June 15, 2023, Freeport sent an email to Partners, stating that it had determined that water/sewer was not, and would not be, available to the Property within 90 days and requiring Partners make its election whether to proceed with the Agreement and the Additional Earnest Money Deposit or to terminate the Agreement within thirty (30) days. The 30 days were to run on July 15, 2023, which was a Saturday. On Monday, July 17, 2023, having received no response from Partners and based on Partners abject failure to take any reasonable steps to obtain the Approvals or otherwise communicate with Freeport, Freeport terminated the agreement. However, later that same day, therefore within the time specified,

Partners sent correspondence asserting its election to proceed with the agreement. Following this exchange, Freeport re-iterated that it had terminated the contract for a failure of performance by Partners.

First, the purported contract lacked essential terms and was so vague that it is unenforceable. It failed to specify deadlines for Partners to secure Approvals or to apply for water/sewer availability. Because of this, Partners had an unending option contract to purchase land with only a refundable deposit, which was not at risk. Therefore, the purported contract lacked essential terms and is unenforceable. The Contract, including its addenda, is also legally unenforceable because of a failure to have mutuality: mutuality of obligation and mutuality of remedy. A cursory review of the purported contract terms evidences the fact that there was no timeframe within which Plaintiff was required to take any action whatsoever thereby making the purported contract illusory for lack of a date for final performance.

However, even if the contract is enforceable, Partners breached the contract by failing to take any of the necessary steps to obtain the Approvals necessary to close the Inspection Period and move the contract to its conclusion. Instead, Partners allegedly had a seemingly countless number of "strategy meetings" to discuss how to develop a property for which a PDP had already been approved. This tactic served to delay the process in a manner meant to hold Freeport to the terms of the alleged contract, without comporting to the time is of the essence term. Partners, therefore,

should be estopped from enforcing terms of an agreement to which they do not conform. Partners is seeking not to advance the purported contract by this suit, but rather, to hold open their option contract unbounded by time restraints, therefore they come to this Court with unclean hands and should be further prevented from holding open the contract.

Because the purported contract at issue lacks essential terms, is vague, is unenforceable for failure of mutuality and a lack of meeting of the minds, Summary Judgment must be granted to Freeport. Even if the contract were enforceable, because Partners breached the contract prior to Freeport terminating the agreement, Summary Judgment must be granted to Freeport. Lastly, because Partners is seeking a Declaratory Judgment to which they are not entitled because of their unclean hands, this Court must grant Summary Judgment in favor of Freeport.

## STATEMENT OF UNDISPUTED FACTS

Freeport obtained Resolution 2018-16 from the City designating the "Preserve" Mixed Use PDP as an approved mixed-use project in 2018. ECF No. 42-2 - Resolution 2018-16. In 2019, the City amended the Municipal Code to revise the fees associated with water and wastewater systems. ECF No. 42-3 - Ordinance 2019-03. This ordinance provided that "Capacity Fees stated in this section shall be due and payable, in full, at the time an application for a Development Order is applied for, and no Development Order, approval, or other authority permitting the

commencement of development of any kind shall be permitted until the City has received payment in full of such fees." ECF No. 42-3, at 3.

In March 2021, representatives from Freeport and Partners had their first face-to-face meeting, the purpose of which, at first, was to allow Partners to purchase Freeport wholly as an entity, which in the end transformed into Partners purchasing only the Property. ECF 42-4 - Deposition of Don Carll, as Corporate Representative of 331 Partners, LLC. at 39, lines 3-22. Don Carll ("Mr. Carll"), was identified as the Corporate Representative for Partners, and Daniel Hayes ("Mr. Hayes"), was identified as the Corporate Representative for Freeport. ECF No. 42-4, at 13, lines 10-12; ECF No. 42-5 – Deposition of Daniel Hayes, as Corporate Representative of 331 Freeport Partners, LLC., at 9, lines 15-20. They negotiated the terms of the agreement. ECF No. 42-4, at 37-38, lines 23-1; ECF No. 42-5 at 58, lines 21-22. The entitlements that ran with the land were provided to Partners by Freeport on July 2, 2021, via email. ECF No. 42-5, at page 55, lines 6-21. The contract consisted of a Florida Bar form contract for vacant land contracts and three attached exhibits. ECF No. 42-5, at 37, lines 9-14; ECF No. 42-1. The attached exhibits were to supplement the VLC with just those specialized terms and conditions that Partners needed. ECF No. 42-5, at 37, lines 17-24. The contract was executed on July 6, 2021, well after the change in the City's Municipal Code requiring the pre-payment of water/sewer

fees in conjunction with the submission of a Developer Order Application. ECF No. 42-1, at 8.

In the VLC, Paragraph 11 states that "[t]ime is of the essence in this Contract." ECF No. 42-1, at 5, ¶ 238-39. Paragraph 15 requires both parties to use diligence and good faith in performing all obligations under the contract. ECF No. 42-1, at 5, ¶ 269. Exhibit A, titled Additional Terms and Conditions, contains the majority of the controlling terms. ECF No. 42-1, at 9-18. Exhibit B was the legal description of the property and Exhibit C was the Escrow Agent Acceptance an Agreement of the Escrow Agent. ECF No. 42-1, at 19-26.

In Exhibit A, Partners is given the option to purchase the Property either at one closing or to elect to close in four installments, with the installment option the default if Partners did not make an election. ECF No. 42-1, at 9-12. The installments had designated takedowns, which were one-quarter of the Property. ECF No. 42-1, at 9-12. The Earnest Money deposit of $50,000 was refundable and is held by the Escrow Agent, Nancy Honsa. ECF No. 42-6 - Escrow Agent Acknowledgement. The VLC contemplated an a minimum 120-day Inspection Period during which Partners could continue its own due diligence in an effort to obtain the Approvals prior to purchasing any portion of the Property. ECF No. 42-1, at 13. The Inspection Period, specified in section four, was 120 days from the Effective Date of the Contract or "the date on which [Partners] receives the Approvals, as hereinafter

defined…" ECF No. 42-1, at 13-15. The term Approvals meant approvals from the City of the Master Development Plan "together with city-approved concurrency availability" and an approved Developer's Agreement. ECF No. 42-1, at 13-15. This section further specified:

> In the event after One Hundred Fifty (150) days after the Effective Date [Freeport] determines in its reasonable discretion that (i) the City Approval is not available within the next ninety (90) days or will not be obtainable by the parties after diligent application, or (ii) water/sewer availability is not available or obtainable by the parties for the Property (or, if the parties agree in writing, the portion of the Property for the first Designated Takedown by the first Designated Takedown date), then [Freeport] may elect to require [Partners] to make its determination within the Inspection Period whether to proceed with the Agreement and make the Additional Earnest Money Deposit whereupon the Earnest Money would be at risk subject to the terms and conditions herein, or to terminate the Agreement, without waiting for the City Approval, whereupon Buyer must make such election within thirty (30) days of notice or [Freeport] may terminate the Agreement of right.

ECF No. 42-1, at 14-15.

The prior language from the Contract contemplated that Partners would make an additional deposit of $200,000.00 as earnest money, which would be combined with the initial $50,000 deposit and be at risk. ECF No. 42-1 at 13. Mr. Carll, of Partners, testified during his deposition that he does not even believe that the quoted provision should be able to be enforced as written because he does not believe that the language of the provision represents the agreement of the parties. ECF No. 42-4, at 174, lines 8-25.

Freeport, in the agreement, retained the right to approve submissions to the City and to "require that no materially adverse modification be made to the existing entitlements." ECF No. 42-1, at 14. Assuming Partners elected to proceed with the Contract at the close of the Inspection Period, Closing was to be the later of 180 days following the expiration of the Inspection Period or the date that the City delivered adequate water/sewer but in no event beyond 24 months from the expiration of the Inspection Period. ECF No. 42-1 at 15-17. Partners had no right to assign the agreement except to an entity owned by and controlled by the same principals or an entity that met Freeport's reasonable satisfaction. ECF No. 42-1 at 17.

Nancy Honsa, the escrow agent, acknowledged the receipt of the initial deposit on July 14, 2021. ECF No. 42-6. The receipt also states that it would be several weeks before title could be ordered due to the Inspection Period and four part planned take downs. ECF No. 42-6.

Bruton Campbell-Work, Esq. ("Mr. Campbell-Work"), an attorney at Clark Partington represented Partners as local counsel during the negotiations of the contract. ECF 42-7 - Deposition of Bruton Campbell-Work, at page 10, lines 6-7. He stated that the title commitment was never ordered because of issues surrounding the identification of the first take down. ECF No. 42-7, at 22, lines 16-22. He had to have Freeport waive conflict before he could represent Partners due to having worked with Freeport on other legal issues and because of that, he withdrew once

the parties came into conflict in 2023. ECF No. 42-7, at 10, lines 10-11; at 23, lines 12-17. Because he represented Partners during the transaction, Partners could have requested the title commitments at any time through Mr. Campbell-Work. ECF No. 42-7, at 26, lines 9-19. Partners failed at any point to ever request the title commitments from Mr. Campbell-Work. ECF No. 42-7, lines 16-21.

The Planning Director of the City, Latilda Hughes-Neel ("Ms. Hughes-Neel"), is the person who processes all development applications through the City, including multi-use planned development projects. ECF 42-8 - Deposition of Latilda Hughes-Neel at 8. She explained that future land use maps and zoning applications must be submitted together for a specific development site plan, which are adopted by ordinance. ECF No. 42-8, at 18-20, lines 1-4 Conceptual plans have no weight with the City because they are conceptual and subject to change. ECF No. 42-8 at 18, lines 7-9. Following a zoning application, a PDP application must be submitted and go through public hearings, first with the Planning Board and then through City Counsel, then may be adopted by resolution. ECF No. 42-8, at 18-19, lines 10-22. Ordinances require two hearings, while resolutions require only one hearing. ECF No. 42-8 at 19, lines 23-35. PDPs include entitlements which a piece of land is vested for, including the number of single family and multi-family units and commercial developments that are allowed. ECF No. 42-8, at 20-21, lines 13-2. Entitlements remain in place unless the PDP is amended or there is a request to rescind the PDP.

ECF No. 42-8, at 21, lines 2-7. A master plan would be associated with the PDP, which the owner of the property would follow in order to get the PDP in place. ECF No. 42-8 at 22, lines 4-9.

The Preserve PDP, which was in place for the Property, would have created a new community, with a number of variances that were afforded to the original development. ECF No. 42-8, at 37, lines 5-13. One of the issues surrounding the Property was the availability of water/sewer. ECF No. 42-8, at 43, lines 9-23. There was limited sewer already available on the south end of the Property, because there is a post office that was there previously. ECF No. 42-8, at 43, lines 14-23. A new sewer main that was designed to handle all of the development on 331 North, including the Preserve PDP, was ultimately completed in July 2023. ECF No. 42-8, at 46, lines 1-20. The City was very clear, through Latilda Hughes-Neel, that unless and until you submit a development order application and pay capacity fees, no one is vested, including for water/sewer. ECF No. 42-8, at 48-49, lines 16-8. However, while the City had the capacity to connect the Preserve PDP to the water/sewer system, until the development project is submitted and capacity fees are paid, no letters guaranteeing capacity could be issued. ECF No. 42-8, at 48-49, lines 16-8. The fees for water/sewer are calculated according to a table in the land development code. ECF No. 42-8, at 61, lines 8-17.

August Andrews ("Mr. Andrews") met with the City at least three times regarding the Property, according to Latilda Hughes-Neel, and often would check on the timeline of water/sewer availability. ECF No. 42-8, at 67, lines 10-16; and 85, lines 7-13. Mr. Carll met with Ms. Hughes-Neel in person once, was in her office twice, by zoom once, and participated in several phone calls. ECF No. 42-8, at 68-69, lines 21-3. The meetings with him were always in regards to the Property. ECF No. 42-8, at 69, lines 4-9. Holly Hankinson worked on Mr. Carll's behalf and met with the City several times to confirm which applications needed to be submitted when. ECF No. 42-8, at 69, lines 10-19. Several engineers associated with the project met with the City. ECF No. 42-8, at 69-71, lines 24-12.

Several times, Partners discussed rezoning the Property, with the City, with many discussions about how different scenarios could work. ECF No. 42-8, at 77, lines 9-22. However, Partners never submitted any applications at all. ECF No. 42-8, at 77, lines 24-25. Very early in the process, Partners also discussed adding to the existing Preserve PDP approximately 267 acres of land which was also part of the Contract. ECF No. 42-8, at 78, lines 1-4; ECF No. 42-9 – City of Freeport Re-Zoning Application, at 2. Partners wanted the City to guarantee that the City would serve Partners with water/sewer at the meetings. ECF No. 42-8, at 92, lines 7-21. Partners did have one pre-application meeting about the 267 acres, which was not part of the Preserve PDP on July 29, 2021. ECF No. 42-8, at 94, lines 1-23; ECF No. 42-9.

Partners did attempt to have temporary package plants to provide water/sewer to the Property connected, however, that plan never went forward because Partners never submitted any development applications. ECF No. 42-8, at 96, lines 6-7; 97, lines 5-7. Another pre-application meeting was held regarding the Preserve PDP and applying for a development order around that PDP on October 16, 2023, after the contract had been terminated by Freeport, and even at that time it was contemplated that there would be an amendment to a substantial portion of the PDP. ECF No. 42-8, at 107-08, lines 18-15; 110, lines 2-5.

To take a property from rezoning to breaking ground, the property would first have to be rezoned, then the PDP can be amended, then the development order application is the last step. ECF No. 42-8, at 123, lines 11-19. The rezoning typically takes three to four months. ECF No. 42-8, at 123, lines 11-19. A PDP amendment takes three to four months, following the rezoning. ECF No. 42-8, at 123-24, lines 21-2. City Council has complete discretion of whether to allow a developer to change any previously granted variances. ECF No. 42-8, at 38, lines 10-23. A development order application then takes another three to four months. ECF No. 42-8, at 125-26, lines 25-8. Therefore, for the full process it takes approximately one year. ECF No. 42-8, at 125-26, lines 25-8. Vesting sewer and water occurs during the development order process, at the pre-construction process. ECF No. 42-8, at 126, lines 1-16. If an entity were to take a pre-approved PDP, such as the Preserve PDP, and submit a

development order, it would still take approximately three to four months to have the development order approved. ECF No. 42-8, at 126, lines 17-24.

After the Agreement was executed, Partners was to work with diligence and good faith in pursuing the Approvals and water/sewer availability. ECF No. 42-1, at 5, ¶ 238-39; ¶ 269. However, over the time frame from July 2021 to May 2023, Partners did not submit to the City either an application to rezone the property, amend the PDP, or to seek a development order on the Preserve PDP. ECF No. 42-8, at 127-28, lines 23-3. Mr. Carll or Holly Hankinson, acting on behalf of Partners, met with or had telephone conferences with Latilda Hughes-Neel, the City Planner, thirteen (13) times over that time period, all but one which were in 2021. ECF No. 42-4, at 59, lines 6-10; 70, lines 7-15; 84, lines 8-15, 89-90, lines 24-6, 92, lines 9-15; 97, lines 15-19; 104, lines 6-21; 105-06, lines 23-10; 112, lines 1-12; 116-17, lines 21-3; 122, lines 2-20; 124, lines 11-20; 146, lines 11-17. However, he could not recall details about any particular meetings, he did not make notes on the meetings he took. ECF No. 42-4, at 59, lines 6-10; 70, lines 7-15; 84, lines 8-15, 89-90, lines 24-6, 92, lines 9-15; 97, lines 15-19; 104, lines 6-21; 105-06, lines 23-10; 112, lines 1-12; 116-17, lines 21-3; 122, lines 2-20; 124, lines 11-20; 146, lines 11-17. Beginning in August 2021, the meetings with the City were to apply for package plants for water/sewer which in the end were not possible for use at the Property. ECF No. 42-4, at 76-79, lines 14-6. Following the package plant unavailability,

Partners would meet with the City to update them on the plan, the roads, the sewer availability, locations of lift stations, and other topics. ECF No. 42-5, at 124-25, lines 16-3.

Mr. Carll stated he took forty (40) flights in relation to the Property. ECF No. 42-4, at 52, lines 1-9. He would often take more than one meeting when he made the flights, some with the City, but approximately 25 times the flights were to hold meetings with the land planner, architect, or engineer, for strategy. ECF No. 42-4, at 59-161. He also met with representatives regarding a "Crystal Lagoon" feature, which he considered adding to the Property. ECF No. 42-4, at 55-56, lines 12-10. The Crystal Lagoon feature would not have required an amendment to the PDP, unless Partners decided it should be located in an area of the PDP that had been designated residential. ECF No. 42-8, at lines 7-12.

Mr. Carll stated that Mr. Andrews was a representative of Freeport and that he met with Partners and the City regarding rezoning the Property at least once. ECF No. 42-4, at 43-44, lines 20-4. Mr. Carll claimed that Partners was confused about the entitlements on the Property. ECF No. 42-4, at 44-45, lines 13-9. He claimed that Partners submitted a formal request to Freeport to modify the existing entitlements on the PDP. ECF No. 42-4, at 45, lines 10-17. However, he could not state when that was submitted. ECF No. 42-4, at 45, lines 10-17. The only formal request that Freeport received was in November 2023, four months after the purported Contract

was terminated by Freeport. ECF No. 42-10 – Request for Seller Cooperation and Approval.

Mr. Andrews was often included in the meetings Partners had with "influential government players." ECF No. 42-4, at 57-58, lines 21-3. He was also kept apprised of what Partners was doing. ECF No. 42-4, at 90, lines 7-19. Mr. Andrews owns thirteen (13) percent, as a membership interest, of Freeport. ECF No. 42-11 - August G. Andrews, Jr. Deposition, at 15 lines 6-8. Mr. Andrews assisted Mr. Carll in any way he could when Mr. Carll was in town, to get the deal done, including meeting with the City and engineers. ECF No. 42-11, at 27, lines 6-16. Mr. Carll stated that at some point he came to believe that Freeport was acting in "bad faith" because he believed Freeport had another buyer interested however, this was only a feeling as Mr. Carll had no evidence of any such circumstance. ECF No. 42-4, at 172- 76, lines 15-18; 178-80, lines 5-9.

In January 2023, there was either a Zoom or telephonic meeting between Partners and Freeport, where Freeport attempted to ascertain Partner's plans regarding the Property, however, the call dropped and was never able to continue. ECF No. 42-5, at 93-94, lines 8-19. On May 2, 2023, there was an email exchange between Partners and the City regarding the availability of sewer and water taps for the Property. ECF No. 42-4, at 166-71, lines 1-2; ECF No. 42-8, at 105-06, lines 5-8. The City would give Partners no answer other than that there were no vested rights

until a Development Order Application was submitted and fees were paid. ECF No. 42-8, at 106, lines 5-8. By May 18, 2023, Partners had not submitted a development order application. ECF No. 42-4, at 172, lines 4-14.

On May 18, 2023, at Mr. Andrews' request, Ms. Hughes-Neel issued a memorandum to Daniel Hayes regarding the current sewer capacity for the Property. ECF No. 42-8, at 106-07, lines 14-12; ECF No. 42-12 – Memo on Sewer and Water Capacity. Mr. Carll received the document. ECF No. 42-4, at 171, lines 5-13. Mr. Hayes asked for that memorandum to clarify that water/sewer capacity was available and how Partners could acquire those rights. ECF No. 42-5, at 88, lines 6-9. The memorandum was sent as an attachment to an email from Mr. Hayes to Mr. Carll, the purpose of which was to again attempt to prompt Partners to take steps towards obtaining a development order. ECF No. 42-5, at 88, lines 14-24. Mr. Carll believed he did respond to that email. ECF No. 42-4, at 180-81, lines 10-7. He stated it could have been via email or otherwise, but contends he informed Freeport that Partners was in communication with the engineer in charge of water/sewer expansion. ECF No. 42-4, at 181, lines 1-7.

However, no response was received by either Mr. Hayes or Mr. Andrews, so Mr. Hayes sent the "Trigger Notice" on June 15, 2023. ECF No. 42-5, at 95, lines 1-9. The Trigger Notice was an email that Mr. Hayes sent to Mr. Carll and others, stating that Freeport had determined that Approvals were not available within 90

days and requiring Partners to make their election no later than July 15, 2023 whether to proceed with the agreement. ECF No. 42-13 - Trigger Notice Email; ECF No. 42-4, at177, lines 7-25; ECF No. 42-5, at 92-93, lines 13-4. At that point, Freeport believed, based on the memorandum from Ms. Hughes-Neel, that Partners would not be able to obtain Approvals, i.e. vested water/sewer rights, within the next ninety (90) days due to having failed to even submit a Development Order Application. ECF No. 42-5, at 98-99, lines 19-23. Mr. Carll claimed not to have received the Trigger Notice until July 13, 2023, he stated because his email and computer crashed. ECF No. 42-4, at 188-89; lines 10-5. The Trigger Notice was sent via email to both of Mr. Carll's email addresses. ECF No. 42-4, at 188, lines 10-18.

On July 17, 2023, Freeport sent an email stating that as they had received no response to the Trigger Notice, they were terminating the agreement. ECF No. 42-14 - July 17, 2023 email from Daniel Hayes to Don Carll. Following that email, Freeport considered the contract terminated and therefore did not cooperate with any further requests from Partners. ECF No. 42-5, at 103, lines 8-13. Later that same day, Partners, through Christina Graham, Esq. an attorney at Morris, Manning, and Martin, a Georgia law firm, responded to the Trigger Notice that while they believed that the Trigger Notice was improper and that Freeport was not entitled to send the Trigger Notice at all, Partners was proceeding with the transaction and would make

the Additional Earnest Money Deposit. ECF No. 42-15 - Correspondence from Christina Graham.

Following the termination of the agreement by Freeport, Partners belatedly started taking at least some more meaningful steps towards obtaining Approvals as it should have done for the prior two-plus years. They held a pre-application meeting on October 16, 2023 with the City towards obtaining a Development Order. ECF No. 42-8, at 107-08, lines 19-15; ECF No. 42-9. They also inquired about using an environmental assessment that was from 2015, which is a prerequisite to a Development Application, with their submissions, however, Ms. Hughes-Neel told them they had to have an assessment that was less than one year old. ECF No. 42-8, at 113-14, lines 16-10. On November 16, 2023, Partners sent Freeport correspondence demanding cooperation and approvals, specifically as to an attached Development Order Application, which was essentially a generic application with nothing attached. ECF No. 42-10; ECF No. 42-5, at 109-10, lines 14-2. In the letter, Partners acknowledges that there are at least twelve documents that are required by the City for issuance of a DO but that they had not yet obtained, further demonstrating that even 4 months after the Contract was terminated that Partners was wholly unprepared to move forward with the purchase. ECF No. 42-10, at 2. As the correspondence was received in November 2023 after the agreement was

terminated, Freeport simply handed it over to its then-counsel to deal with and did not otherwise respond. ECF No. 42-5, at 110, lines 3-6.

## ARGUMENT

### Summary Judgment Standard

The standard for granting summary judgment is well known. Summary judgment is appropriate where the Court is satisfied "that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." *Gas Kwick, Inc. v. United Pac. Ins. Co.*, 58 F.3d 1536, 1538 (11th Cir. 1995); Fed. R. Civ. P. 56(c). Summary judgment is appropriate where the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 3317, 322 (1986). A movant carries its burden by showing that there is an absence of evidence supporting the non-movant's case. *Denney v. City of Albany,* 247 F.3d 1172, 1181 (11th Cir. 2001). The burden then shifts to the non-movant, who must go beyond the pleadings and present affirmative evidence to show a genuine issue for trial. *Porter v. Ray,* 461 F.3d 1315, 1320 (11th Cir. 2006). Florida law governs diversity cases and the alleged contract at issue has a choice of venue provision electing to proceed under Florida law. In Florida, "contract language must be given its plain meaning." *Langford v. Paravant, Inc.*, 912 So.2d 359, 360 (Fla. 5th DCA 2005).

## The Contract is Unenforceable

"[T]he question of whether a valid contract exists is a threshold question of law that may be properly decided by the court." *Kolodziej v. Mason*, 774 F.3d 736, 740 (11th Cir. 2014). There must be a meeting of the minds, for a contract to be valid and enforceable, on all essential terms and obligations of the contract. *Silk Road Trading & Shipping Co. v. World Fuel Servs. Corp.*, 572 F. Supp. 3d 1296, 1303 (S.D. Fla. 2021). The alleged contract at issue in this case is unenforceable because it lacks mutuality of obligation and remedy, lacks essential terms, and is thus illusory.

Where a party retains the option of fulfilling or declining to fulfill its obligations under the contract, there is no valid contract. *Miami Coca-Cola Bottling co. v. Orange-Crush Co.*, 291 F.102 (D. Fla. 1923). Contracts not mutually enforceable are illusory. *Pan-Am Tobacco Corp v. Dep't of Corr.*, 471 So. 2d 1260, 1270 (Fla. 2008). "Mutuality of obligation and remedy must exist for a specific performance suit to succeed." *Burger Chef Systems, Inc. v. Burger Chef of Florida*, Inc., 317 So. 2d 795, 797 (Fla. 4th DCA 1975). The Court in *Burger Chef System, Inc.*, in expounding on this rule stated: "Insofar as mutuality of remedies is concerned, it is clear that there must be a recognized mutability of remedies in equity between the parties to the suit which can constitute a basis for awarding specific performance in equity against the complainant, as against the defendant." *Id.*;

*Sanchez v. Crandon Wholesale Drug Co.*, 173 So. 2d 687 (Fla. 1965). "It is well settled 'that parties to a contract may agree to limit their respective remedies and that those remedies need not be the same.'" *Redington Grand, LLP v. Level 10 Props., LLC*, 22 So. 3d 604, 608 (Fla. 2d DCA 2009) (quoting *Ocean Dunes of Hutchinson Island Dev. Corp. v. Colangelo*, 463 So. 2d 437, 439 (Fla. 4th DCA 1985).

"The definition of 'essential term' varies widely according to the nature and complexity of each transaction and is evaluated on a case-by-case basis." *Lanza v. Damian Carpentry, Inc.*, 6 So. 3d 674, 676 (Fla. 1st DCA 2009). Quality, quantity, and price may be essential terms to a contract and the lack thereof may render a contract invalid. *Jacksonville Port Auth. V. W.R. Johnson Enters., Inc.*, 624 So. 2d 313, 315 (Fla. 1st DCA 1993). First, material terms are those terms that are essential to the performance and enforcement of the contract, not just those terms that a party considers material. *DigiART, LLC v. Casale*, No. 6:22-CV-494-WWB-RMN, 2023 WL 6038109, at *4 (M.D. Fla. Sept. 15, 2023), see also "Material Term", Black's Law Dictionary (11th ed. 2019). In that case, the time a term began was found by the court to be an essential term. *DigiART*, at page *4.

According to the contract, the Inspection Period was to run until Partners **received** the Approvals. ECF No. 42-1. There was, however, no provision in the agreement forcing Partners to apply for Approvals by a certain date, therefore, if

Partners never applied, the inspection period would never close. There was no provision in the contract for remedy if Partners breached. If "[a] return of one's own money hardly constitutes damages in any meaningful sense," then a loss of two years to develop a property and the lack of any compensation for it, would therefore not be a meaningful remedy. *Ocean Dunes* at, 439. Therefore, this agreement which essentially was an indefinite option contract, secured on a refundable $50,000 deposit, was without a meaningful remedy for Freeport in the event that Partners breached by failing to take any meaningful action towards closing the Inspection Period, as they did. Freeport had no equal right to enforce sale and closing, nor did it have equal right to terminate, if that was against Partners' elections. Based upon the plain language of the document, as long as there was some basis by which Partners could claim that the Approvals could be obtained within 90 days, which is what Partners is claiming in this case, there was no action that could be taken by Freeport to close the inspection period to force the contract to its conclusion. Instead, Partners would presumably have had the right to simply hold the "option" for purchase open *ad infinitum* without being required to take any action whatsoever. Because Florida requires mutuality of obligation and remedy, the contract is not valid.

Further, the purported contract at issue lacked essential terms. While the Approvals were clearly of the utmost importance in the contract and to the parties,

the failure to identify a timeline by which Partners must apply for the approvals was a gross oversight. Partners, knowing it had no obligation to perform under the contract, then essentially did nothing to advance the contract for two years. Because a timeline would be an essential term of this contract, the contract, by lacking terms, was unenforceable. Therefore, the contract must be found illusory, unenforceable, and thus summary judgment should be granted to Freeport.

Lastly, there was clearly no meeting of the minds in relation to the events that would allow Freeport to send the Trigger Notice, seemingly its only method for terminating the contract. Mr. Carll testified during his deposition that he believed the plain language of the agreement allowing the trigger notice was not intended to be enforced. ECF No. 42-4, at 174, lines 12-21. Rather, Mr. Carll contends that the Trigger Notice was simply to allow the parties to come together to deal with a circumstance where the City was unable to provide sewer to the property. ECF No. 42-4, at 174, lines 12-21. Mr. Carll did not believe the trigger notice was intended to apply to a circumstance wherein Freeport asked "can you get all your engineering done in time to get a permit or a tap in 90 days." ECF No. 42-4, at 174, lines 12-21. Obviously, this is not what Freeport understood from the agreement. If there was no meeting of the minds as to the sole basis by which Freeport could exit the agreement or force Partners to proceed, then there was no meeting of the minds whatsoever as to the parties' obligations under the contract. In the absence of a

meeting of the minds, the contract was never formed and summary judgment should be granted to Freeport.

### Partners Breached the Contract

By failing to demonstrate to Freeport that it was ready, willing, and able to comply with its part of the agreement for approximately 2 years, Partners breached the alleged contract. "If one party to an agreement has breached the agreement, the other party's failure to continue with the agreement is not considered a default of the contract." *Ryan v. Landsource Holding Co., LLC*, 127 So. 3d 764, 768 (Fla. 2d DCA 2013); *Jones v. Warmack*, 967 So.2d 400, 402 (Fla. 1st DCA 2007). "If such a breach occurs, then the nondefaulting party is relieved of its obligations under the contract." *Id*.; *see also Fabel v. Masterson*, 951 So.2d 934, 936 (Fla. 4th DCA 2007). When determining the true meaning of a contract and which party breached, Courts look to the intent of the parties. *Jones*, 967 So. 2d at 402. "Of course, where a contract's terms are clear and unambiguous, the court looks no further than the plain meaning of the language used in the contract as the best expression of the parties' intent." *Grove Harbour Marina v. Grove Bay Investment Group, LLC*, 2024 WL 2176716, *4 (Fla. 3d DCA 2024); *see, e.g., Pearson v. Caterpillar Fin. Servs. Corp.*, 60 So.3d 1168, 1171 (Fla. 4th DCA 2011).

The *Jones* case is demonstrative. 967 So.2d at 400. In that case, the Seller had the obligation under the contract to provide title, which it did. *Id*. at 401. The Buyer

had the obligation to state objections to the provided title, which it did. *Id.*. However, the contract broke down, when Seller informed the Buyer that they did not have the ability to cure the defects to the title and asked the Buyer to make their election whether or not to proceed with the contract within ten (10) days. *Id.* However, Buyer's third deposit was due prior to the expiration of the ten days and they did not make that deposit. *Id.* Therefore, Seller determined there was a breach and terminated the contract. *Id.* Later that same day, Buyer notified Seller that they were not proceeding under the contract and that they were entitled to their deposits back. *Id.*

The Court, in *Jones*, determined that Seller was correct. 967 So.2d at 402. Because Buyer had breached by failing to pay their last deposit, Seller was entitled to terminate the contract. *Id*, at 402. "Under the language of the contract as a whole, the parties did not intend the title to be without defect but, rather, to be the best title to which Buyer would agree…" *Id.* Buyer had argued that because Seller delivered a title with defects, it relieved them of their responsibility to pay their last deposit until the 10 days had passed. *Id.* However, the Court found that argument to be without merit and found that because Buyer had breached the contract first, Seller was entitled to terminate it. *Id.*

Under the alleged contract at issue here, Partners had an obligation to use due diligence and good faith and to adhere to the "timeliness is of the essence" clause of

the contract. Time is of the essence clauses are not stock phrases in real estate contracts and therefore, give rights to cancel a contract when buyers are unable to demonstrate the ability to purchase in a timely manner. *Garcia v. Alfonso*, 490 So.2d 130, 130 (Fla. 3d DCA 1986). In *Orlando Reality Board Bldg. Corp. v. Hilpert*, 93 Fla. 964, 956 (Fla. 1927), the Florida Supreme Court stated where a party is seeking specific performance he "should allege and prove that he was ready, willing and able to comply with his part of the agreement on or before the date agreed upon for performance, if time is made of the essence, or within a reasonable time if it is not…." However, for twenty-three months, Partners took no formal steps with the City or Freeport to obtain Approvals or secure vested water/sewer rights, to close the Inspection Period and move forward with the purchase of the property. It is clear from Exhibit A that Approvals and water/sewer rights were of paramount importance to Partners, therefore diligent pursuit of the Approvals and water/sewer rights, by submission of applications for those rights, was of essence to the contract. However, Partner's actions, including multiple "strategy meetings," meetings with the City, and engaging of engineers, while failing to complete any pre-application meetings, applications for rezoning, amending the PDP, or development order, were not adherence to the contract.

Nor were there any submissions, prior to termination of the contract in July 2023, to Freeport to advance the project, as required under the contract. In fact, after

the contract was terminated, the purported Development Order Application that Partners submitted to Freeport for cooperation and approval was deficient, especially when considering that in submitting the Application, Partners stated that they had failed to obtain many basic documents despite knowing they were required. There were no actual steps taken towards receiving Approvals, as they did not apply for the Approvals at any time. An endless string of redesigns and the creation of new conceptual plans simply does not represent the taking of any concrete steps towards advancing the contract at issue. Therefore, Freeport determined that Partners breached the contract, at which time, Freeport terminated the contract.

Further, Freeport gave Partners opportunity to cure the default on the contract, in May 2023. Freeport emailed Partners on May 5, 2023, following up on previous conversations, to attempt to determine Partners' plans. ECF No. 42-13, at 4-6. While Partners responded to the May 5 email, it was merely to state that they believed all of the water/sewer taps were committed to other projects, that they were pushing for commitment from the City that they would receive water/sewer taps if they submitted a development order, and that they were "staying on top" of the developments. ECF No. 42-13, at 4-5. Freeport subsequently requested and received from the City a memorandum regarding the Sewer and Water Capacity/Vesting for Service on 331 North in Freeport. ECF No. 42-12. Freeport sent the memorandum to Partners and asked Partners to please make submissions to the City. ECF No. 42-

13, at 3-4. Freeport asked Partners for a timeline of its application process with the City, but no response was forthcoming from Partners. ECF No. 42-13, at 3-4. Latilda Hughes-Neel, the City Planner consistently stated that prior to the City providing any commitments for sewer and water, a developer had to have the pre-application meeting, submit a development order, and pay the fees associated, then, the development would be vested. Mr. Carll seemingly wanted to bypass the City's stated policies and have guarantees before putting any money or effort in to the project. Because he could not convince Ms. Hughes-Neel to do so, Partners continued to be delinquent in its obligations to move with diligence to obtain vested water/sewer rights for the project.

Partners has routinely argued that the plain language of the contract should apply when it comes to things like needing to send the Trigger Notice to the broker, but then wants to apply an unreasonableness standard to the language of the contract in relation to the grounds for the Trigger Notice. Mr. Carll testified, in essence, that the ability to send the Trigger Notice if City Approval could not be obtained within 90 days in the face of a process that took 120 days to navigate means the provision should never be able to be enforced. ECF No. 42-4, at 174, lines 12-21; 178-79, lines 19-13. Again, Partners simply cannot have it both ways. Either the contract language is to be plainly construed as written or not. Further, Partners should be estopped from seeking to enforce a contract that it has breached. Because Partners breached before

Freeport, assuming *arguendo* there is even a breach by Freeport, by failing to take any of the necessary formal steps to close the Inspection Period to move the contract to its conclusion after approximately two years, summary judgment must be granted to Freeport.

### Partners Is Not Entitled to Declaratory Relief

Partners seeks a Declaratory Judgment that Freeport is "obligated to abide by the terms and conditions of the Contract, including but not limited to allowing [Partners] the right to exercise its **option** to purchase the Property…" ECF No. 1 ¶33, *emphasis added*. Partners doesn't seek to close the Inspection Period and move the contract forward, they instead ask the court to declare the Trigger Notice invalid and to put the parties back to the positions they were in prior to the Trigger Notice: an unending Inspection Period. "It is a fundamental principle of equity that no one shall be permitted to profit from his own fraud or wrongdoing, and that one who seeks the aid of equity must do so with clean hands." *Yost v. Rieve Enters., Inc.*, 461 So.2d 178, 184 (Fla. 1st DCA 1984).

The doctrine of unclean hands requires first, that one party's wrongdoing is directly related to the claim and second, that the other party was injured by the first party's conduct. *Calloway v. Partners Nat. Health Plans*, 986 F.2d 446, 451 (11th Cir. 1993). "Equity will stay its hand where a party is guilty of conduct condemned by honest and reasonable men. Unscrupulous practices, overreaching, concealment,

trickery or other unconscientious conduct are sufficient to bar relief." 22 Fla. Jur. 2d, Equity § 50; *Hansel v. Aurilio*, 417 So.2d 1035, 1038 (Fla. 4th DCA 1982); see also *Precision Instrument Mfg. Co. v. Auto. Mant. Mach. Co.*, 324 U.S. 806, 814 (1945).

By Partner's actions, or rather, failure to act, they have unscrupulously retained a large piece of property, to Freeport's detriment, with only a refundable deposit for over two years. Partners had the onus to act, by taking steps towards obtaining Approvals either by rezoning the Property and amending the PDP or by submitting a development application. Instead, it failed to do anything, while assuring Freeport that it was "staying on top" of the City, the water and sewer rights, and the developments. It is the affirmative misconduct of relaying to Freeport that it was working to move the contract forward, while at the same time refusing to submit any applications to the City to actually move the contract forward, which gave Partners unclean hands. Further, Partners actions post breach are illustrative of their mode of operations. By sending Freeport a wholly deficient Development Order Application with their Request for Seller's Cooperation and Approvals, while stating that they had not obtained any of the many documents that the City would require prior to issuance of the Development Order, shows that they had no intent to ever seek Approvals or water/sewer taps under the alleged contract. Further, the request for Freeport's approvals, without providing Freeport the supporting documents,

eliminated Freeport's ability to know what Partners was seeking approval of, which was a breach of the contracted right of Freeport to review submissions. ECF No. 42-10; ECF No. 42-1 at 14. Because parties with unclean hands should not profit from their misconduct, this Court should grant Summary Judgment in favor of Freeport.

## Conclusion

Because the purported contract at issue lacks essential terms, is vague, is unenforceable for failure of mutuality and a lack of meeting of the minds, Summary Judgment must be granted to Freeport. Even if the contract were enforceable, because Partners breached the contract prior to Freeport terminating the agreement, Summary Judgment must be granted to Freeport. Lastly, because Partners is seeking a Declaratory Judgment to which they are not entitled because of their unclean hands, this Court must grant Summary Judgment in favor of Freeport.

/s/ *William R. Sickler*
William R. Sickler • FBN 0070639
robbie@guildaylaw.com
Colleen D. Mullen Yorio • FBN 100327
colleen@guildaylaw.com
Guilday Law, P.A.
1983 Centre Pointe Blvd., Suite 200
Tallahassee, FL 32308
Secondary:  stephanie@guildaylaw.com
             dana@guildaylaw.com
(850) 224-7091 (Telephone)
(850) 222-2593 (Facsimile)
*Attorneys for Defendant*

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 56.1

I certify that this document complies with the 8,000 word limit of Local Rule 56.1(E) because it contains 7,993 words, exclusive of those portions exempted under the Local Rule.

/s/ *William R. Sickler*
William R. Sickler • FBN 0070639

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on October 18, 2024, a true and correct copy of the foregoing has been furnished electronically by the CM/ECF system to:

Charles T. Wiggins
Matthew P. Massey
Beggs & Lane RLLP
501 Commendencia Street
Pensacola, FL 32502
ctw@beggslane.com
mpm@beggslane.com

/s/*William R. Sickler*
Attorney