# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
### PENSACOLA DIVISION

**331 PARTNERS, LLC,**
**a Georgia Limited Liability Company,**

      **Plaintiff,**

**v.**                      **Case No.: 3:23-cv-24769-TKW-ZCB**

**331 FREEPORT PARTNERS, LLC,**
**a Florida Limited Liability Company,**

      **Defendant.**

_____/

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

This Court should deny Defendant's motion for summary judgment (ECF No. 43). Defendant's motion is without merit because (1) Defendant is estopped from challenging the validity of the Contract due to its actions for two years; (2) the Contract is enforceable; (3) Plaintiff did not breach the Contract; and (4) Plaintiff does not have "unclean hands."

## RESPONSE TO DEFENDANT'S STATEMENT OF FACTS

- <u>Paragraphs 1–4, pages 5–7</u>: Plaintiff takes no issue for purposes of the motion.

- <u>Paragraph 5, page 8</u>: Plaintiff disputes Defendant's characterization of Mr. Carll's testimony. Mr. Carll's testimony at page 174:8-25 of ECF No. 42-4 speaks for itself. In particular, the referenced pincite does not include the

1

word "enforce" or Mr. Carll's alleged subjective beliefs about legal enforceability as suggested by Defendant. *Id*.

- Paragraph 6, page 9: Plaintiff takes no issue for purposes of the motion.

- Paragraph 7, page 9: Plaintiff disputes Defendant's phrase "could be ordered." The email at ECF No. 42-6 speaks for itself. Moreover, the Contract provides that Defendant was obligated to provide the title evidence within 15 days after the Contract's effective date. ECF No. 42-1 at 2. Defendant failed to do this. ECF No. 42-5 at 45:10-18.

- Paragraph 8, page 9: Plaintiff disputes Defendant's characterization of Mr. Campbell-Work's testimony. Mr. Campbell-Work's testimony at page 22:16-22 (ECF No. 42-7) speaks for itself. In particular, Mr. Campbell-Work testified, "I think it -- you know, part of that explanation may be the nature of that agreement being either a takedown or a full purchase of the property. I think maybe the commitment was waiting to be ordered once property was identified, but no, no title commitment was ordered." *Id*. Moreover, the Contract provides at page 2 that Defendant was obligated to provide the title evidence within 15 days after the Contract's effective date. ECF No. 42-1 at 2. Defendant failed to do this. ECF No. 42-5 at 45:10-18. Plaintiff did not "fail" to comply with a condition that Defendant—not Plaintiff—was obligated to perform.

- <u>Paragraph 9, page 10</u>: Plaintiff takes no issue for purposes of the motion.

- <u>Paragraph 10, page 11</u>: Plaintiff disputes Defendant's characterization of Mr. Ms. Hughes-Neel's testimony. She testified on July 17, 2024, that "by October, we will have a two-million-gallon-per-day plant accepting sewer from all over the city." ECF No. 42-8 at 43:14-20. Ms. Hughes-Neel also testified that prepayment of taps would be "several million" dollars. ECF No. 61:18-62:4.

- <u>Paragraph 11, page 12</u>: Plaintiff disputes Defendant's characterization of Mr. Carll's meetings. Ms. Hughes-Neel testified at her deposition that she met Mr. Carll in person at least once, had "at least one Zoom type of call with him," may have had one conference call or more with Mr. Carll, and engaged in several phone calls—though she admitted, "I don't really recall specifics." ECF No. 42-8 at 68:2-69:3. However, Mr. Carll testified to a wide variety of consultations with Ms. Hughes-Neel and/or the City Engineer, ECF No. 42-4 at 59:6-17, 84:8-15, 89:19-90:6, 92:11-93:2, 97:15-19, 98:6-12, 104:6-106:20, 112:1-12, 117:17-118:8, 123:17-124:15; meetings with engineers, *see, e.g., id.* at 50:10-17, 83:6-84:7, 91:9-15, 160:15-161:18; conferences with various homebuilders, *see, e.g.,* at 59:18-60:23, 71:5-11, 85:9-17, 86:22-88:1; meetings with land planners and architects, *see, e.g.,* at 70:16-71:4, 73:24-74:21, 90:20-91:13, 93:12-24, 98:17-99:3, 103:18-104:5, 152:22-153:2,

155:14-156:9; and visits with government officials such as the Florida Department of Transportation and other City employees, *see, e.g.,* at 71:12-23, 119:11-21. Plaintiff's Engineer Keith Dantin also testified about his meetings regarding this project. *See, e.g.,* ECF No. 47-2 at 28:16-31:23.

- Paragraph 12, page 12: Plaintiff disputes the accuracy of Defendant's contention that temporary package plants were not obtained because Plaintiff never submitted development applications. Package plants were not needed and/or not a possibility for this planned development project. *See* ECF No. 42-4 at 76:19-78:25, 81:21-82:3. Ms. Hughes-Neel also testified that "[t]hey really needed for the City to do their [sewer] project and then to connect to it, because the numbers just don't work." ECF No. 42-8 at 92:22-24. Sewer to the whole property was not available until the sewer main was complete. *Id.* at 86:7-12.

- Paragraph 13, page 13: Plaintiff disputes the accuracy of Defendant's contention that "for the full process it takes approximately one year." Ms. Hughes-Neel testified "[i]t's possible, I can't guarantee it, but it's possible you can get a development order at the end of a year," and "you might be able to do that in a year, but there are no guarantees." ECF No. 42-8 at 125:6-12.

- <u>Paragraph 14, page 14</u>: Plaintiff disputes that Mr. Carll could not recall details of any particular meetings. Mr. Carll testified at length about his meetings, *see* ECF No. 42-4, including meetings about rezoning. *Id.* at 43:20-44:4.

- <u>Paragraph 15, page 15</u>: Plaintiff takes no issue for purposes of the motion.

- <u>Paragraph 16, page 15</u>: Plaintiff disputes the accuracy of Defendant's contention about the rezoning meetings. Mr. Carll testified about many meetings, for example: "So I don't know about your date but we have had many of our meetings with the City and with one of the sellers, Gus Andrews, about rezoning the property. Gus even patched in I believe it was Dan Hayes and said 'I believe it's our obligation to rezone this property. What do you want to do here?' So many of our meetings were pertaining to the rezoning." *See* ECF No. 42-4 at 43:22-44:4. Mr. Carll also testified that Plaintiff did not submit for a pre-application meeting prior to June 15, 2023, because Ms. Hughes-Neel "recommended that we wait for a more friendly city council." *Id.* at 182:1-7.

- <u>Paragraph 17, page 16</u>: Plaintiff takes no issue for purposes of the motion.

- <u>Paragraph 18, page 16</u>: Plaintiff disputes the characterization of these facts. Ms. Hughes-Neel testified sewer was not available to the rest of the property until the sewer main was complete, ECF No. 42-8 at 86:7-12, albeit requiring

Plaintiff's pre-payment of "several millions" in fees prior to that completion. *Id.* at 61:18-62:4.

- Paragraph 19, page 17: Plaintiff disputes the characterization of these facts. Mr. Carll explained, "[W]e [were] working towards that timeframe that they [were] telling us we will have availability and capacity [in June of 2024]," ECF No. 42-4 at 181:5-12, and that Plaintiff was informed that the City was "nowhere near able to supply the capacity required for this development or even a full phase of it, but that by June of 2024 they would be able to supply what they felt was 100 to 300 homesites." *Id.* at 161:19-25. Thus, Plaintiff "notified the seller that we would like to close in June of 2024." *Id.* at 46:15-16.

- Paragraph 20, page 18: Plaintiff disputes these facts as incomplete. The Trigger Notice was not sent to the Broker of Record, Kay Eubanks, *see* ECF No. 42-5 at 49:13-16, as required by Section 14 of the Contract. ECF No. 42-1 at 5.

- Paragraph 21, page 19: Plaintiff disputes these facts as incomplete. Plaintiff had until the close of business on July 17, 2023, to elect to proceed with the Contract, ECF No. 42-1 at 15. Plaintiff timely elected to proceed with the Contract albeit disputing the validity of the Trigger Notice. *See* ECF No. 42-15.

- <u>Paragraph 22, page 19</u>: Plaintiff disputes Defendant's characterizations, including the terms "belatedly" and "generic application." The exhibits speak for themselves. Moreover, on August 10, 2023, Plaintiff's counsel wrote to Defendant advising that "[a]s we have reiterated several times, the Buyer is committed to closing on the transaction contemplated by the PSA within the parameters agreed to by the parties." *See* ECF No. 47-1 at 2.

## **ARGUMENT**

Plaintiff asks the Court to deny Defendant's motion for summary judgment and, pursuant to Plaintiff's own summary judgment motion (ECF No. 40), declare the executory nature of the contract executed by the parties in July 2021 (the "Contract") that provided Plaintiff the right to purchase approximately 1,034 acres of vacant land from Defendant.

In its motion, Defendant argues (1) the Contract is unenforceable; (2) Plaintiff breached the Contract; and (3) Plaintiff is not entitled to a Declaratory Judgment. *See* ECF No. 43. These arguments are unavailing, and Defendant should further be estopped from contesting the executory nature of this Contract because Defendant acted for approximately two years as if the Contract were valid and executory.

1. **DEFENDANT IS ESTOPPED FROM CHALLENGING THE ENFORCEABILITY OF THE CONTRACT.**

As an initial matter, Defendant should be estopped from contesting the executory nature of this Contract.

Florida substantive law holds that the doctrine of equitable estoppel may be applied "in all cases where one, by word, act or conduct willfully cause[s] another to believe in the existence of a certain state of things, and thereby induces him to act on this belief injuriously to himself, or to alter his own previous conditions to his injury." *State ex rel. Watson v. Gray*, 48 So.2d 84, 87-88 (Fla. 1950). Estoppel has the effect of precluding a party, both at law and in equity, from asserting rights which may have "otherwise existed, either of property, of contract, or of remedy, as against another person, who has in good faith relied upon such conduct, and has been led thereby to change his position for the worse, and who on his part acquires some corresponding right, either of property, of contract or of remedy." *Id.* The purpose of the doctrine is to ensure the continued application of the principles of fair play and essential justice. *Fla. Dep't of Health & Rehab. Servs. v. S.A.P*, 835 So.2d 1091, 1096 (Fla. 2002).

To establish equitable estoppel a party must demonstrate: "(1) the party against whom estoppel is sought must have made a representation about a material fact that is contrary to a position it later asserts; (2) the party claiming estoppel must have relied on that representation; and (3) the party seeking estoppel must have

changed his position to his detriment based on the representation and his reliance on it." *Watson Clinic, LLP v. Verzosa*, 816 So.2d 832, 834 (Fla. 2d DCA 2002). A party raising estoppel must prove these elements by clear and convincing evidence. *Id.*

In the context of contracts, the doctrine of equitable estoppel provides that "once a party accepts the proceeds and benefits of a contract, that party is estopped from renouncing the burdens the contract places upon him." *Fineberg v. Kline*, 542 So.2d 1002, 1004 (Fla. 3d DCA 1988). Furthermore, "one who accepts the benefits of a contract cannot, having retained these benefits, question the validity of the contract." *Billings v. City of Orlando*, 287 So.2d 316, 318 (Fla. 1973).

Federal courts sitting in Florida are in full accord. *See, e.g., Sphinx Int'l v. Nat'l Union Fire Ins. Co.*, 226 F. Supp. 2d 1326, 1333 (M.D. Fla. 2002) (*citing Spurrier v. United Bank*, 359 So.2d 908, 910 (Fla. 1st DCA 1978) for the proposition that "Florida follows the generally accepted contract principle that 'one may not accept the fruits of a contract and at the same time renounce, or repudiate, the burdens which that contract places on him.'").

The facts show that Defendant is estopped—by way of its words and actions for approximately two years after executing the Contract—from now denying the validity of the Contract. As to the first element, Defendant represented that the Contract was valid and binding upon both parties, and that it intended to sell Plaintiff the Property in exchange for an agreed upon sum of money. This is evidenced not

only by the written and signed Contract that the parties signed, ECF No. 42-1, but by the fact that Defendant allowed Plaintiff to deposit $250,000 into escrow. *See* ECF No. 42-5 at 43:11-24. Furthermore, Defendant represented that the Contract was valid and binding through its actions by citing the Trigger Notice provision when it first attempted to exit the agreement nearly two years after the Contract was signed. *See* ECF No. 42-1; ECF No. 42-13. Not once did Defendant claim (until now) the Contract was invalid.

As to the second element—reliance—the evidence before the Court shows that Plaintiff relied upon Defendant's representation that the Contract was valid and binding to Plaintiff's detriment. Plaintiff deposited $250,000 in earnest money payments according to the terms of the Contract. *See* ECF No. 42-5 at 43:11-24. Furthermore, Plaintiff invested substantial time and effort in reliance on the Contract, including but not limited to interstate travel, *see* ECF No. 42-4 at 51:18-52:9; consultations with the City of Freeport's Manager and/or City Engineer; *see, e.g., id.* at 59:6-17, 84:8-15, 89:19-90:6, 92:11-93:2, 97:15-19, 98:6-12, 104:6-106:20, 112:1-12, 117:17-118:8, 123:17-124:15; visits to locations showcasing other development models, *see, e.g.,* at 55:12-56:3, 67:19-68:2; meetings with engineers, *see, e.g., id.* at 50:10-17, 83:6-84:7, 91:9-15, 160:15-161:18; conferences with homebuilders to discuss development, *see, e.g.,* at 59:18-60:23, 71:5-11, 85:9-17, 86:22-88:1; meetings with land planners and architects, *see, e.g.,* at 70:16-71:4,

73:24-74:21, 90:20-91:13, 93:12-24, 98:17-99:3, 103:18-104:5, 152:22-153:2, 155:14-156:9; and, visits with government officials such as the Florida Department of Transportation and other City employees, *see, e.g.,* at 71:12-23, 119:11-21. Plaintiff clearly invested substantial resources in reliance on the Contract.

As to the third element, Plaintiff's reliance upon Defendant's actions has been to Plaintiff's detriment. Plaintiff's representative Mr. Carll testified extensively about the time and resources, *see supra*, devoted in furtherance of the Contract. Now, after allowing Plaintiff to devote those resources and money, Defendant suggests that the Contract never existed in the first place. Florida law and equity do not countenance such an outcome.

Finally, Defendant accepted the benefit of the Contract to sell the property to Plaintiff in exchange for a considerable sum of money. *See* ECF No. 42-1. Defendant allowed Plaintiff to take actions in furtherance of the Contract and to submit $250,000 in earnest money. ECF No. 42-5 at 43:11-24. Furthermore, Defendant attempted to benefit from the Contract's Trigger Notice provision when it first attempted to exit the agreement. *See* ECF No. 42-1; ECF No. 42-13. All these facts squarely support application of the estoppel doctrine.

The case of *Gleason v. Leadership Hous., Inc.* is instructive. 327 So.2d 101 (Fla. 4th DCA 1976). In that case, Jackie Gleason entered into a written land sales agreement with Behring Corp. The agreement provided Gleason the right to

purchase a portion of a 3,000-acre tract of land at a "bargain" price. *Id.* at 102. In exchange, Gleason gave Behring the right to use Gleason's name to publicize and promote a planned real estate development concerning the rest of the 3,000 acres as well as his help in designing a golf course and organizing a tournament. *Id.* Behring then refused to sell Gleason a tract of land meeting the standards set forth in the contract, instead offering alternative tracts which Gleason declined. *Id.* at 103. Gleason eventually sought specific performance. *Id.* Behring claimed that the contract was not valid and violated the Statute of Frauds because it failed to identify a specifically identifiable tract of land. *Id.*

On appeal, the court found that Behring was "estopped to contest validity of the agreement under the doctrine of equitable estoppel." *Id.* The *Gleason* court held that Behring "sought to adopt, to Gleason's prejudice, a position completely inconsistent with that taken by it prior to litigation, and upon which Gleason relied…continuously over a three-year period led Gleason to believe that the contract was valid and that land meeting the contract standards would be conveyed to him." *Id.* at 104. This reliance was to Gleason's detriment "for had he known that [Behring] would subsequently shift its position from one of recognition of the obligation to one contesting the validity of the agreement, he could have acquiesced in the selection of Tract 27 as a palatable alternative to the present litigation." *Id.* at 104-105. The court also recognized that Behring reaped certain benefits from the

contract, and that "Gleason could conceivably receive no benefit whatever [o]ther than the 'bargain' land sale should the other provisions of the contract self-terminate." *Id.* In conclusion, Behring "manifested an intention to honor the contract and…accepted the benefits due it thereunder," and, therefore, was "estopped to deny the contract's validity." *Id.*

*Gleason* supports the finding that Defendant is estopped from denying the Contract's validity. As in *Gleason*, Defendant "manifested an intention to honor the [C]ontract" for two years. *See Gleason*, 327 So.2d at 105. Following the initiation of this litigation, Defendant for the first time claimed that the Contract was never valid. This is in clear contradiction to Defendant's actions and representations during the previous two years. Also, as was the case in *Gleason*, Defendant "accepted the benefits due it" under the Contract, *id*. at 105, through Plaintiff's deposit of $250,000 in earnest money payments and its own citations to the Contract's Trigger Notice provision. *See* ECF Nos. 42-5 at 43:11-24, ECF No. 42-13 at 3-4. Under Florida law, Defendant should not be allowed to now deny the validity of the Contract after two years of behaving the opposite.

These facts evidence the type of injustice and unfair play which the doctrine was created to prevent. *See Fla. Dep't of Health & Rehab. Servs.*, 835 So.2d at 1096.

Thus, based upon its previous conduct and representations, Defendant should be estopped from now arguing that the Contract is invalid and unenforceable.

## 2. THE CONTRACT IS ENFORCEABLE.

Defendant argues that the Contract is unenforceable. *See* ECF No. 43, at 21. The Court should firmly reject this misguided argument.

### a. WANT OF MUTUALITY OF OBLIGATION AND REMEDY ARE NOT DEFENSES TO AN EXECUTED CONTRACT; AND EVEN IF THEY ARE, THEY ARE SATISFIED.

Defendant claims the Contract is unenforceable for lack of mutuality because there was no provision in the Contract to force Plaintiff to act by a particular date certain. ECF No. 43, at 22-23. Defendant's mutuality/obligation argument should be flatly rejected as contrary to the law and facts before this Court.

Defendant's argument is misplaced in this declaratory action lawsuit. "An absence of mutuality of remedies will not destroy an agreement's validity." *Redington Grand, Ltd. Liab. P'ship v. Level 10 Props., Ltd. Liab. Co.*, 22 So.3d 604, 608 (Fla. 2d DCA 2009) (citation omitted). In *Wright & Seaton, Inc. v. Prescott*, the court recognized that "[w]ant of mutuality is no defense in the case of an executed contract, and a promise lacking mutuality at its inception becomes binding on the promisor after performance by the promisee." 420 So.2d 623, 627 (Fla. 4th DCA 1982) (citation omitted). "Mutuality of remedy in contracts as a requirement has

largely disappeared from the law of American jurisdictions." *LaBonte Precision, Inc. v. LPI Indus. Corp.*, 507 So.2d 1202, 1203 (Fla. 4th DCA 1987).

On the other hand—for an action claiming specific performance—"Florida law is clear 'there must exist a recognized mutuality of remedies in equity between the parties to the suit which can constitute a basis for awarding specific performance in equity to the complainant, as against the defendant.'" *DiMauro v. Martin*, 359 So.3d 3, 7 (Fla. 4th DCA 2023). Thus, while mutuality may be a requirement for a specific performance claim, that concept does not apply to this case. Plaintiff has not asserted a claim for specific performance. *See* ECF No. 1. Rather, Plaintiff's claim is for a declaratory judgment by which Plaintiff asks the Court to declare the Contract executory such that the parties' rights and obligations still exist.

However, even if mutuality of remedy was a contractual requirement for the Contract to be enforceable, such mutuality exists in this case. "It is well settled 'that parties to a contract may agree to limit their respective remedies and that those remedies need not be the same.'" *Redington Grand, LLP v. Level 10 Props., LLC*, 22 So.3d 604, 608 (Fla. 2d DCA 2009) (quoting *Ocean Dunes of Hutchinson Island Dev. Corp. v. Colangelo*, 463 So.2d 437, 439 (Fla. 4th DCA 1985)); *see also* ECF No. 43 at 22 (citing the same). That is what happened here. Defendant enjoyed the Trigger Notice provision and attempted to exercise that remedy by sending Plaintiff the Trigger Notice. *See* ECF No. 42-13. Defendant admits the Trigger Notice was

"its only method for terminating the contract." ECF No. 43 at 24. The fact that the Contract afforded Plaintiff the ability to proceed with the Contract and move to the post-Inspection Period (while contesting the Trigger Notice's validity) under a new timeline does not deprive Defendant of a remedy. Rather, this is the remedy that the parties chose when they executed the Contract.

Defendant does not cite to any authority providing that the remedies must be equal. Thus, while the parties' remedies may not be identical, Defendant certainly had the ability to act to enforce the Contract or terminate it, thus providing mutuality.

Regarding mutuality of obligation, Defendant's argument is again misguided. "Obligation pertains to the consideration while remedy pertains to the means of enforcement." *Bacon v. Karr*, 139 So.2d 166, 169 (Fla. 2d DCA 1962). "Mutual obligation is essential, but the means of enforcement may differ without necessarily affecting the reciprocal obligations of the parties." *Id*. Here, there was sufficient consideration in the way of promised payment, *see* ECF No. 42-1; therefore, there was mutuality of obligation. In *Parker v. Weiss*, the court found that "the purchaser's promise to pay in exchange for the vendor's executory agreement" was sufficient consideration to form a contract for the sale of land. 404 So.2d 820, 821 (Fla. 1st

DCA 1981). The consideration here is the same as *Parker*, thus there is consideration and mutuality of obligation.

For these reasons, this Court should reject Defendant's argument that the Contract is unenforceable for lack of mutuality.

### b. THE CONTRACT CONTAINS THE ESSENTIAL TERMS AND A REASONABLE TIME WILL BE INFERRED.

The Contract is a valid executory legal document because it meets all of the elements required by Florida law. Defendant has challenged the validity of the Contract because the parties executed a Contract that does not identify a discrete deadline by which Plaintiff must apply for the City's approval. ECF No. 43 at 23-24. Therefore, according to Defendant, the Contract is unenforceable. *Id*.

Florida law says otherwise. A contract must be definite and certain as to the parties' obligations and all other essential elements, and what terms are essential to a contract will vary based on the nature and complexity of the transaction. *Socarras v. Claughton Hotels, Inc.*, 374 So.2d 1057, 1059-60 (Fla. 3d DCA 1979). In the context of real estate and land contracts, the following are considered essential terms: (1) a description of the land, *Boardwalk at Daytona Dev., LLC v. Paspalakis*, 220 So.3d 457, 461 (Fla. 5th DCA 2016); (2) an identification of the critical parties such as the buyer, *Socarras v. Claughton Hotels, Inc.*, 374 So.2d 1057, 1060 (Fla. 3d DCA 1979) (finding a contract to lack the essential terms in part because "the identity of the ultimate purchasers is not given."); (3) the price to be paid by the

purchaser, or, at least, a basis for its ascertainment, *Grover v. Jacksonville Golfair, Inc.*, 914 So.2d 995, 996 (Fla. 1st DCA 2005); and (4) any financing terms, *Bus. Specialists, Inc. v. Land & Sea Petroleum, Inc.*, 25 So.3d 693, 695 (Fla. 4th DCA 2010). Defendant does not cite, and Plaintiff is unaware of, any Florida law dictating that every land sale contract must include a particular date certain for a party to apply for land development approvals.

Rather, Florida law explicitly holds that a contract containing an indefinite time period for performance does not render the contract invalid or unenforceable. *Cain v. Banka*, 932 So.2d 575, 581 (Fla. 5th DCA 2006). Where a contract is silent as to the duration of a time period, the following standard is applied:

> When a contract does not contain an express statement as to duration, the court should determine the intent of the parties by examining the surrounding circumstances and by reasonably construing the agreement as a whole…If a period of duration can be inferred from the nature of a contract and the circumstances surrounding its execution, the contract is not terminable at will and a court should give effect to the manifest intent of the parties.

*City of Homestead v. Beard*, 600 So.2d 450, 453 (Fla. 1992). *See also Doolittle v. Fruehauf Corp.*, 332 So.2d 107 (Fla. 1st DCA 1976) (granting specific performance to enforce an option to purchase land despite no time set for performance because "when there is no time set for the performance of a certain act, it is interpreted to mean that the act must be done within a reasonable time"). "[W]hen no time or an indeterminate or indefinite time is specified for the performance of an act, the law

implies that such act will be performed within a reasonable time." *Hatcher v. Miller*, 427 So.2d 1039, 1040 (Fla. 1st DCA 1980).

The fact that the Inspection Period does not mandate or define a specific and identifiable end date does not create a "never ending" Inspection Period and certainly does not render the Contract unenforceable. Rather, the Inspection Period is appropriately interpreted as extending for a reasonable period of time. In determining what constitutes a reasonable period of time, relevant factors are the subject matter of the contract, the parties' situation, the parties' intentions, and the surrounding circumstances of performance. *Andean Life, LLC v. Barry Callebaut U.S.A. LLC,* No. 20-20765-CIV-WILLIAMS/TORRES, 2021 U.S. Dist. LEXIS 261619, at *26 (S.D. Fla. Sep. 29, 2021) (citing *Hicks v. Keebler*, 312 So.3d 1001, 1005 (Fla. 2d DCA 2021)).

Here, the subject matter of the Contract is approximately 1,034 acres of raw land. *See* ECF No. 42-1. Plaintiff's corporate representative Mr. Carll described the moving dynamics associated with the multi-stage, multi-year process associated with this type of large-scale development, and recounted the many consultations, meetings, visits, and conferences he conducted in his efforts to move the development process forward. *See generally, e.g.,* ECF No. 42-4 at 50:10-17, 51:18-52:9, 59:6-17, 78:5-79:6, 83:6-15, 89:19-124:15. The City of Freeport's Planning Director corroborated the complexity of this process, including how a developer

must procure input from public officials, address any requested revisions, conduct preconstruction conferences, coordinate utility/roadway placement and access, submit subdivision plats, and receive approval by City officials. *See* ECF No. 42-8 at 23:1-31:20. Engineer Keith Dantin further confirmed the intricacies involved in all these moving parts, opining it is "easily a three-year project, in my opinion, if not more." *See* ECF No. 47-2 at 72:11-77:9.

Here, while Defendant claims that failure to identify a timeline by which Plaintiff must apply for approvals was a "gross oversight," ECF No. 43 at 24, the parties both knew this was not a transaction that would be closed and developed within a matter of weeks or months. Both Plaintiff and Defendant, through their corporate representatives, confirmed that large developments of this nature are, by necessity, quite lengthy. Mr. Carll testified that these developments may take two to five years "just to come out of the ground," and that this particular project was complicated by timeline changes arising from the City's plans for sewer capacity. *See, e.g.,* ECF No. 42-4 at 127:6-21, 138:7-11. Mr. Hayes testified about examples from his own experience, including:

> For example, the project that's immediately to my right here at Palm Beach County went through a development process that took two-and-a-half years and required modification of both the zoning and the development plan guidelines for the city so that we could build what we wanted to build.

ECF No. 42-5 at 16:25-17:5. For another project, Mr. Hayes testified that "the contract was around for two or three years while they took the project, the portion of the project that they were going to develop through the development process." *Id*. at 34:14-22. However, "[i]t might have been longer." *Id.* at 79:15-23.

Indeed, the absence of a hard-and-fast deadline in the Contract confirms that the parties had full knowledge that the development process is complicated and lengthy. The parties exchanged various iterations and drafts of the Contract prior to execution, *see, e.g.,* ECF No. 42-5 at 55:2-9, and both parties chose to execute the Contract without a particular date certain for the end of the Inspection Period. *See generally* ECF No. 42-1. This does not make the Contract unenforceable—especially in a case where, such as here, the total time from Contract execution to the Trigger Notice was well within the multi-year time period attendant to these types of development projects. Therefore, the Contract does not lack essential terms as to the time period to obtain approvals and this Court should deny Defendant's Motion for Summary Judgment.

### c. MEETING OF THE MINDS.

Defendant suggests that the Contract is unenforceable because there was no meeting of the minds in relation to the events that would allow Defendant to send the Trigger Notice, its only method for terminating the contract. ECF No. 43 at 24. Defendant claims that Mr. Carll's subjective interpretation of the reason for the

Trigger Notice provision is enough to show that "[i]f there was no meeting of the minds as to the sole basis by which [Defendant] could exit the agreement or force [Plaintiff] to proceed, then there was no meeting of the minds whatsoever as to the parties' obligations under the contract." ECF No. 43 at 24.

Mr. Carll's testimony, read in its entirety, does not support Defendant's contention that the parties did not have a meeting of the minds. Mr. Carll testified:

> In our negotiations in the contract, the trigger notice was for one thing only. If we had both spent time and money and got to a point where we realized the City was unable to provide sewer to this property, then there would be a trigger notice that would set forth what happens once we receive that notice, but the trigger notice was determined by my -- by Morris Manning Martin, a law firm in Atlanta, to be a false trigger, not what the trigger was for.
>
> The false trigger was can you get all your engineering done in time to get a permit or a tap in 90 days. It wasn't is [sic] the City going to be able to provide you taps within 90 days.

ECF No. 42-4 at 164:12-25. Mr. Carll clarified at other points that he is not a lawyer, *id.* at 41:24, and that he relies on "legal counsel to let me know what the contract says." *Id.* at 196:6-7. Mr. Carll did not testify as suggested by Defendant and did not comment on this provision's enforceability. *See generally id*.

The thrust of Defendant's argument appears to be that Plaintiff made a unilateral mistake such that the court should not enforce the Contract. *See United States v. Navolio*, No. 6:06-cv-1461-Orl-19GJK, 2008 U.S. Dist. LEXIS 62724, at *10 (M.D. Fla. Aug. 6, 2008) (citing *Roberts & Schaefer Co. v. Hardaway Co.*, 152

F.3d 1283, 1291 (11th Cir. 1998)) ("When one of the parties to a contract has made a unilateral mistake, Florida case law follows the minority rule and permits rescission of the contract."). "Florida case law allows for application of the unilateral mistake doctrine where all of the following conditions are met: (1) the mistake 'goes to the substance of the agreement,' (2) the error does not result from an inexcusable lack of due care, and (3) the other party has not relied upon the mistake to his detriment." *Roberts & Schaefer Co. v. Hardaway Co.*, 152 F.3d 1283, 1291 (11th Cir. 1998) (internal citation omitted).

Defendant's apparent "unilateral mistake" argument misses the mark factually and legally. This is not the type of case, for example, where a party testifies that they mistakenly signed an agreement. *See, e.g., Bethlehem Steel Corp. v. Centex Corp.*, 327 So .2d 837, 838 (Fla. 3d DCA 1976). Nor, for example, is this the type of case where one party mistakenly believes a claim was being settled on behalf of an insured where—in fact—the insured did not actually enjoy an active insurance policy. *See, e.g, Md. Cas. Co. v. Krasnek*, 174 So.2d 541, 541 (Fla. 1965). In fact, it is the opposite—Plaintiff seeks a ruling from the Court that the Contract is indeed valid and executory. In other words, Defendant seems to argue that Plaintiff's alleged mistake (not Defendant's mistake) is enough for Defendant to be released from the Contract. That is not the fact pattern contemplated by the law. Moreover, Mr. Carll's testimony falls far from any suggestion that "the contract was never

formed." ECF No. 43 at 25. At most, Mr. Carll testified about his layperson understanding of a certain clause. Defendant's argument distorts the legal and factual issues at play.

Plaintiff staunchly opposes Defendant's characterization of Mr. Carll's testimony. However, even if the Court were to entertain this argument, it should be denied because any purported mistake does not impact the substance of the Contract. "The first requirement--that a mistake 'go[] to the substance of the agreement'--is compelled by the rule that a meeting of the minds must occur in order to create a contract." *Roberts & Schaefer Co. v. Hardaway Co.*, 152 F.3d 1283, 1291 (11th Cir. 1998). "Thus, as Florida courts have interpreted the standard, a mistake may be found to 'go[] to the substance of the agreement' where, among other circumstances, an employee of a party enters into a contract or releases another party from a contract under the mistaken belief that he is authorized to do so or that the contract pertains to something other than it does." *Id.* at 1291-92.

The alleged mistake made by Plaintiff does not go to the substance of this Contract for vacant land. At most, Mr. Carll's testimony could be read as his non-legal interpretation of why a certain clause was/was not included in the Contract. It does not obviate the legal nature of this Contract, and it falls well short of the fact pattern required by Florida law to show that a contract was never formed. Moreover, Defendant does not set forth a basis for the Court to find to find that the error results

from an excusable lack of due care, nor does Defendant show that Plaintiff has not relied upon the mistake to his detriment. This argument should be denied.

### 3. PLAINTIFF DID NOT BREACH THE CONTRACT.

In its argument, Defendant fails to clearly articulate exactly how, when, or why Plaintiff supposedly breached the Contract. *See* ECF No. 43 at 25-30. While Defendant makes clear that, in hindsight, it wanted Plaintiff to act with more haste, the Contract affords Plaintiff ample time during the Inspection Period to perform its due diligence. *See* ECF No. 42-1 at 13-15. To this point, the parties even contracted for Plaintiff's ability to close without adequate water and sewer capacity. *Id.* at 16. In other words, Plaintiff is fully afforded the ability to conduct its due diligence within the confines of the Contract as it deems fit.

Plaintiff illustrates *Jones v. Warmack*, 967 So.2d 400, 402 (Fla. 1st DCA 2007), for the principle that "[i]f one party to an agreement has breached the agreement, the other party's failure to continue with the agreement is not considered a default of the contract." ECF No. 43 at 25-27. However, Plaintiff never breached the Contract. The *Jones* case cited by Defendant is actually helpful to Plaintiff's position because in *Jones*, the fact pattern at issue clearly showed that the Buyer first

breached the Contract by failing to pay a required deposit on time. *Id.* That is not the case here.

Defendant argues that, by Plaintiff's failure to demonstrate that Plaintiff was ready, willing, and able to comply with its part of the Contract, Plaintiff breached the Contract. *Id.* In making this argument, Defendant cites *Orlando Reality Board Bldg. Corp. v. Hilpert*, 93 Fla. 964, 956 (Fla. 1927), for the proposition that where a party is seeking specific performance, he "should allege and prove that he was ready, willing and able to comply with his part of the agreement on or before the date agreed upon for performance, if time is made of the essence, or within a reasonable time if it is not…." ECF No. 43 at 27.

This argument is unavailing. Again, Defendant confuses Plaintiff's action for declaratory judgment as an action for specific performance. Because Plaintiff has not brought an action for specific performance and Plaintiff has not missed a deadline to comply with the Contract, Plaintiff has not breached the Contract. Moreover, Plaintiff's counsel wrote to Defendant on August 10, 2023, advising that "[a]s we have reiterated several times, the Buyer is committed to closing on the transaction contemplated by the PSA within the parameters agreed to by the parties."

*See* ECF No. 47-1 at 2. There is not sufficient evidence to grant Defendant's motion on this point.

Defendant also alleges that Plaintiff breached its obligations to use due diligence and good faith because "for twenty-three months, [Plaintiff] took no formal steps with the City or [Defendant] to obtain Approvals or secure vested water/sewer rights, to close the Inspection Period and move forward with the purchase of the property." ECF No. 43 at 27. This assertion is contradicted by the facts before the Court that demonstrate Mr. Carll's wide variety of actions, including consults with Ms. Hughes-Neel and/or the City Engineer, *see* ECF No. 42-4 at 59:6-17, 84:8-15, 89:19-90:6, 92:11-93:2, 97:15-19, 98:6-12, 104:6-106:20, 112:1-12, 117:17-118:8, 123:17-124:15; meetings with engineers, *see, e.g., id.* at 50:10-17, 83:6-84:7, 91:9-15, 160:15-161:18; conferences with various homebuilders to discuss development plans, *see, e.g.,* at 59:18-60:23, 71:5-11, 85:9-17, 86:22-88:1; meetings with land planners and architects, *see, e.g.,* at 70:16-71:4, 73:24-74:21, 90:20-91:13, 93:12-24, 98:17-99:3, 103:18-104:5, 152:22-153:2, 155:14-156:9; and, numerous visits with government officials such as the Florida Department of Transportation and other City employees, *see, e.g.,* at 71:12-23, 119:11-21. These actions evidence that Plaintiff has used due diligence and good faith in attempting to obtain the City's approval. The Contract does not require Plaintiff to complete these tasks by a certain date certain. *See generally* ECF No. 42-1. Nonetheless, Plaintiff diligently and in

good faith worked during the due diligence period to advance his position in reliance on the Contract.

Moreover, Defendant never alerted Plaintiff to any alleged breach. It wasn't until after litigation ensued that Plaintiff became aware of this allegation. Defendant alleges that it gave Plaintiff an opportunity to cure the "default" on the Contract in May 2023. ECF No. 43 at 28. However, this "notice" was an email "following up on previous conversations, to attempt to determine [Plaintiff's] plans." *Id*.; ECF No. 42-13 at 4-6. Plaintiff responded to the email stating that it believed all of the water and sewer taps were committed to other projects, but that Plaintiff was "staying on top" of the development, pushing for a commitment from the City that it would receive water and sewer taps. ECF No. 42-13 at 4-5. This exchange is a far cry from a notice of breach and opportunity to cure.

Defendant next claims that Plaintiff breached the Contract by failing to adhere to the "time is of the essence" clause of the Contract by failing to obtain approvals from the City by a particular date. *Id*. at 26-27. While paragraph 11 of the Contract provides for "Computation of Time" and states that "[t]ime is of the essence in this Contract," ECF No. 42-1 at 5, Defendant is mistaken as to the applicability of this "time is of the essence" clause.

Time is considered to be "of the essence" when there is an express recital in the party's contract. *Thomas v. Fusilier*, 966 So.2d 1001, 1003 (Fla. 5th DCA 2007);

*Arvilla Motel, Inc. v. Shriver*, 889 So.2d 887, 890 (Fla. 2d DCA 2004) ("Where it clearly appears from the contract that time is essential, courts will recognize the parties' expressed intention."). However, courts have warned against trying to "achieve this result by merely putting into the contract the words 'time is of the essence of this contract.'" *Id.* at 890 (quoting *Jackson v. Holmes*, 307 So.2d 470, 472 (Fla. 2d DCA 1975)). The reason for this is that "to give effect to such a cryptic provision, [the court must know]: What performance at what time is a condition of which party's duty to do what?" *Id.* (quoting *Jackson*, 307 So.2d at 472). Courts should not apply a general provision that time is of the essence to all of the many "promises for sundry performance, varying in amount and importance," because parties often insert the provisions in the contract without any realization of its significance. *Id.* "In short, a 'time is of the essence' provision will be given effect in an equitable proceeding provided it is shown to be clearly applicable to the contract requirement against which it is sought to be applied." *Jackson*, 307 So.2d at 472.

In *Jackson*, the court concluded that "the clause providing that "time being of the essence of this agreement" was part of a printed form and contained within a paragraph which related to the ultimate closing of the purchase rather than the furnishing of a bank loan certification; therefore, the "time of the essence" clause did not apply to the separate task of the furnishing of a bank loan certification. 307

So.2d at 472.  In contrast, in *Arvilla Motel* the contract included an express "time is of the essence" clause contained in a standard printed form on the first page of the contract stated in bold letters. 889 So.2d at 890. The court found that the parties clearly intended it to apply to the closing date because it was contained under the heading "PURCHASE AND SALE," referring to the ultimate sale of a motel. *Id*. The parties agreed in an addendum to move the closing date to a month earlier than specified in the contract, and the closing date was singled out as being significant; thus, it was the intention of the parties to close earlier. *Id*. at 890-891. Because the parties "clearly intended to make time essential as to the closing date," the *Arvilla Motel* court concluded that the seller had the right to cancel the contract if the buyer was unable to timely demonstrate an ability to perform. *Id*. at 891.

Here, the "time is of the essence" clause is more like *Jackson* than *Arvilla Motel*. The Contract does not expressly provide that Plaintiff was required to rush to obtain the City's approval. *See generally* ECF No. 42-1.  The parties chose not to include a provision requiring Plaintiff to apply for approvals by a date certain.  *Id.* Rather, the parties intended the "time is of the essence" clause to apply when computing time, evidenced by the fact that it was contained under the heading "Computation of Time." ECF No. 42-1 at 5. While this clause may apply to provisions that included specific and quantifiable deadlines, the clause did not apply to obtaining any City approvals. Indeed, Defendant's own corporate representative

testified how a development process takes two or more years. *See* ECF No. 42-5 at 16:25-17:5, 34:14-22. However, "[i]t might have been longer." *Id.* at 79:15-23.

Plaintiff did not breach the Contract. The Court should deny Defendant's argument.

### 4. PLAINTIFF DOES NOT HAVE UNCLEAN HANDS.

Defendant finally argues that Plaintiff is not entitled to declaratory judgment under the doctrine of unclean hands. ECF No. 43 at 31. This argument should be denied.

"Unclean Hands is an equitable defense much like fraud." *U.S. Bank Nat'l Ass'n v. Qadir*, 342 So.3d 855, 859 (Fla. 1st DCA 2022). The defense applies to bar an equitable claim no matter the claim's merits when "the plaintiff has engaged in some manner of unscrupulous conduct, overreaching, or trickery that would be 'condemned by honest and reasonable men.'" *21st Mortg. Corp. v. TSE Plantation, LLC*, 301 So.3d 1120, 1122 (Fla. 1st DCA 2020) (internal citation omitted). Aside from proving condemnable conduct, a party must also prove (1) reliance on the conduct; (2) relation to the litigation; and (3) an injury resulting from the conduct. *U.S. Bank Nat'l Ass'n*, 342 So.3d at 859. Denying a party relief based on unclean hands is an extreme sanction that should be invoked only in the most compelling cases. *Id.* "Merely proving condemnable conduct is not enough." *Id.*

Here, Defendant's allegations fall well short of the required level. Defendant asserts that Plaintiff acted with unclean hands by representing to Defendant that it was working to move the Contract forward but had not yet submitted formal applications to the City. ECF No. 43 at 31. Defendant fails to realize that this representation is, in fact, true—Plaintiff had been working through its various meetings, conferences, and due diligence, *see generally* ECF No. 42-4, while also working in the face of the City's uncertainty about sewer capacity in the future. *See, e.g.,* ECF No. 42-12. This was, in fact, true. At some point, Defendant grew frustrated with these efforts and opted to attempt to assert its rights pursuant to the Trigger Notice. *See* ECF No. 42-13 at 3-4. These facts do not constitute unclean hands and fail to meet any of the elements required of such an accusation.

The case of *U.S. Bank Nat'l Ass'n v. Qadir* is demonstrative of an alleged act that does not rise to the level of condemnable conduct required to support application of the doctrine of unclean hands. 342 So.3d 855. In that case, Mr. Quadir thought he owed U.S. Bank approximately $130,000 after a second modification of his mortgage, and after making a one-time payment, believed he owed around $30,000. *Id*. at 858. Mr. Qadir asked an agent of U.S. Bank what the modification meant and was told "this does not mean anything. I will only be paying on $150,000-something amount that's the principal balance. My payments will be based on that. Interest will be based on that." *Id*. From this statement, Mr. Qadir got the impression that the

deferred balance was "not a big deal and not to worry about it." *Id*. at 858-859. When he requested a payoff, he was told he owed ten times more and no one else at U.S. Bank would give him a straight answer as to why the amount was so much. *Id*. at 858. Frustrated, Mr. Qadir stopped making payments. *Id*. In his defense, Mr. Quadir argued that despite the bank telling him not to worry about the deferred balance from the modification, U.S. bank "changed the amount owed"; thus, U.S Bank acted with unclean hands. *Id*. On appeal, the court ruled that "U.S. Bank's conduct was not sneaky, unscrupulous, or tricky." *Id*. at 859. The court reasoned that the bank agent's statement to Mr. Quadir was an accurate reflection of the modified terms. *Id*. The court also noted that there was nothing in the record to suggest that "the agent made these statements with the intent to deceive." *Id*. Thus, the court ruled that U.S Bank did not act with unclean hands. *Id*.

Here, like in *U.S. Bank Nat'l Ass'n v. Qadir*, Plaintiff's actions do not rise to the type of condemnable conduct required under the doctrine. And, akin to *U.S. Bank Nat'l Ass'n v. Qadir*, Defendant has failed to show that Plaintiff's representations were made with the intent to deceive or otherwise harm Defendant. Rather, Plaintiff was acting in line with a typical development process of this scale, and Defendant did not rely on Plaintiff's representations because it attempted to send a Trigger Notice to force action. *See* ECF No. 42-13 at 3.

Plaintiff has not acted with unclean hands. This Court should deny Defendant's argument on this issue.

## CONCLUSION

WHEREFORE, Plaintiff respectfully requests that the Court deny Defendant's motion for summary judgment.

Respectfully submitted,

*/s/    Matthew P. Massey*
CHARLES T. WIGGINS
Florida Bar No. 220000
ctw@beggslane.com
MATTHEW P. MASSEY
Florida Bar No. 1008337
mpm@beggslane.com
BEGGS & LANE RLLP
501 Commendencia Street
Pensacola, FL  32502
T: (850) 432-2451
F: (850) 469-3331
*Attorneys for 331 Partners, LLC*

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 56.1

I certify that this document complies with the 8,000 word limit of Local Rule 56.1(E) because it contains 7,901 words, exclusive of those portions exempted under the Local Rule.

*s/Matthew P. Massey*
MATTHEW W. MASSEY
Fla. Bar No.: 1008337

## CERTIFICATE OF SERVICE

I CERTIFY that this document has been filed via CM/ECF for electronic distribution to the following counsel on November 8, 2024:

WILLIAM R. SICKLER
Fla. Bar No.: 0070639
robbie@guildaylaw.com
COLLEEN D. MULLEN
Fla. Bar No.: 100327
colleen@guildaylaw.com
GUILDAY LAW, P.A.
1983 Centre Pointe Blvd., Suite 200
Tallahassee, FL 32308
Tel: (850) 224-7091
Attorneys for 331 Freeport Partners, LLC

*s/Matthew P. Massey*
MATTHEW P. MASSEY
Fla. Bar No.: 1008337
