```
 1                    UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF FLORIDA
 2                        PENSACOLA DIVISION


 3
     331 PARTNERS, LLC, A GEORGIA  )
 4   LIMITED LIABILITY COMPANY,    )
                                   )
 5              Plaintiff,         ) Case No: 3:23-CV-24769-TKW
                                   )
 6        v.                       ) Pensacola, Florida
                                   ) February 5, 2025
 7                                 ) 8:58 a.m.
     331 FREEPORT PARTNERS, LLC, A )
 8   FLORIDA LIMITED LIABILITY     )
     COMPANY,                      )
 9                                 )
                Defendant.         )
10   _____)


11

12        ORAL ARGUMENT ON CROSS-MOTIONS FOR SUMMARY JUDGMENT
            BEFORE THE HONORABLE T. KENT WETHERELL, II
13                 UNITED STATES DISTRICT JUDGE
                      (Pages 1 through 87)

14   APPEARANCES:

15   For the Plaintiff:       Beggs & Lane
                              by:  MATTHEW P. MASSEY and
16                                 CHARLES T. WIGGINS
                              501 Commendencia Street
17                            Pensacola, Florida 32501
                              (850) 432-2451
18                            mpm@beggslane.com
                              ctw@beggslane.com
19


20

21   For the Defendant:       Guilday Law
                              by:  WILLIAM R. SICKLER
22                            1566 Village Square Boulevard
                              Tallahassee, Florida 32309
23                            (850) 224-7091
                              robbie@guildaylaw.com

24
                     Julie A. Wycoff, RMR, CRR
25              Official United States Court Reporter
                (850) 470-8196 * julieawycoff@gmail.com
```

1              **P R O C E E D I N G S**

2         *(Call to Order of the Court.)*

3              THE COURT:  Good morning.  Y'all can be seated.

4              MR. SICKLER:  Good morning.

5              MR. MASSEY:  Good morning.

6              THE COURT:  All right.  This is Case

7    Number 3:23cv24769, 331 Partners v. 331 Freeport Partners.

8              Let me begin with appearances please.

9              MR. MASSEY:  Good morning, Your Honor.  Matthew Massey

10   on behalf of the plaintiff.  I'm joined here by my partner,

11   Charlie Wiggins, as well as the client, Don Carll.

12             THE COURT:  Good morning to you.

13             MR. WIGGINS:  Good morning.

14             MR. SICKLER:  Good morning, Your Honor.  William

15   Sickler on behalf of defendant.  I am here by myself.

16             THE COURT:  All right.  The purpose of our time

17   together is to hear oral argument on the parties' cross-motion

18   for summary judgment.  And I guess let me start this way.  I've

19   certainly read everything the parties have filed, read your

20   argument, read the pertinent portions of the record, and I have

21   a pretty good sense of what I think about the case.  But there

22   are a few areas that I wanted to hear from the parties on and

23   make sure I understand correctly and make sure there are no

24   disputed issues of fact here.  And then if there are, figure out

25   whether I can resolve those today or whether we need to have

1    some sort of trial on those, given that I guess this would be a

2    bench trial in any event.

3           And so that's kind of the purpose of today.  My hope

4    is that I can give you if not an oral ruling, an oral sense of

5    where things are and see if that gets us to a point where the

6    parties can move forward with each other or move forward without

7    each other, where that gets us.

8           I've got a little bit of something.  I don't believe

9    I'm contagious, and you're far enough away from me that it won't

10   affect you, but it may affect my ability to communicate with you

11   effective.

12          So with that, Mr. Massey -- are you handling it, or is

13   Mr. Wiggins?

14          MR. MASSEY:  I'll be handling it, Your Honor.

15          THE COURT:  Okay.

16          MR. MASSEY:  Should I go ahead?

17          THE COURT:  Sure.

18          MR. MASSEY:  Thank you.

19          Good morning, Your Honor, and may it please the Court.

20   Matthew Massey on behalf of the plaintiff.  Your Honor, given

21   your remarks at the beginning, I'm happy to either proceed with

22   the argument that I prepared; I'm happy to answer questions.  I

23   defer to the Court.

24          THE COURT:  I'll let you start, and we'll treat it

25   kind of like an appellate oral argument.  And once I feel like I

1    need to jump, I'll jump in, but I'll let you say your piece.  By

2    the time we get out of here, everybody will have said whatever

3    they want to say.  I'm sure of that.

4           MR. MASSEY:  Very well.  Thank you, Your Honor.

5           This is a declaratory action lawsuit.  We're asking

6    the Court to determine that this contract is extant and

7    executory.  That's the issue before the Court.

8           The parties, we believe, maintain their rights, their

9    obligations, and we believe this entire controversy essentially

10   boils down to two things that the Court needs to decide.  First

11   and foremost, is this a valid contract, yes or no?  If it's no,

12   then the ruling is for the defense.  If it's yes, it's for the

13   plaintiffs.  We staunchly maintain that this is a valid

14   contract.  The elements are there:  its offer, acceptance,

15   consideration.  And the parties even used as a model the typical

16   FAR/BAR contract that is used all throughout the state every day

17   for real estate deals.

18           THE COURT:  Well, it seems to me that the provisions

19   in the form contract, the FAR/BAR contract, really are not the

20   key provisions here that there's a dispute over.  It's more the

21   addendum, the exhibit, whatever it was called, that has the

22   narrative discussion about the inspection period and closing,

23   that sort of thing.

24           MR. MASSEY:  Absolutely, Your Honor.  You're exactly

25   right.  There's certainly a lot more moving parts than I would

1    suggest the typical real estate deal that uses the FAR/BAR

2    contract has in this case.  But fundamentally there's really not

3    any practical difference.  There was execution of the contract,

4    the due diligence period, and then a closing deed.  And so we

5    believe that all the elements of a contract are met, the parties

6    were free to enter into this contract, they did, and that the

7    rights and obligations should be maintained.

8         The second issue that the Court must decide is what to

9    do about this trigger notice.  Was the trigger notice effective,

10   yes or no?  If it was effective, I believe that the defendant

11   has conceded that it was timely responded to with the additional

12   $200,000 earnest money deposit.  Therefore the contract --

13        THE COURT:  I guess let's start there then.  Why does

14   it matter whether the trigger notice was effective or not when

15   you responded to it?

16        MR. MASSEY:  As a practical matter, Your Honor, it

17   just determines whether the parties are in the inspection period

18   or the postinspection period.  The postinspection period, once

19   the parties enter into that time frame, there's the 24-month

20   deadline that applies.  Whereas, if we're in the inspection

21   period, that -- the defects and the trigger notice still need to

22   be cured.

23        Perhaps the defense will send it later today,

24   depending if the Court rules in our favor today, but regardless

25   that still maintains the rights and obligations of the parties

1  under the contract.

2      THE COURT:  Why would we go through that exercise?

3  You've -- your client has demonstrated a desire to move forward

4  with the contract.  They paid the additional earnest money

5  deposit.  You know, all that would do would be to kick that

6  process out 30 days.

7      MR. MASSEY:  I understand your point, Your Honor.  I

8  don't necessarily disagree.  We're maintaining that position

9  just because that's the way the contract is written, and we

10  believe that the contract does need to be given full force and

11  effect.

12      THE COURT:  I guess the other thing that I've

13  struggled with about this, and I guess I don't know if it

14  matters or if it's in dispute, is this -- so the trigger notice

15  was sent.  The trigger notice, now I think there's a concession,

16  was timely responded to.  I don't know if I have in the record

17  the date that the additional money was paid, but I don't think

18  there's any dispute that it was paid and whatever the timing of

19  it impacted the validity of your exercise of the trigger, your

20  response to the trigger.

21      And so I guess the question is, is that money -- is

22  that $250,000 now at risk?

23      MR. MASSEY:  The 250,000 is still in escrow.

24      THE COURT:  Right.  But if you walk away from the

25  contract today, is it your position that you get the $250,000

```
 1    back, or is it your position that they get the $250,000?
 2              MR. MASSEY:  The contract makes it refundable, Your
 3    Honor.
 4              THE COURT:  Okay.  Isn't that a problem?
 5              MR. MASSEY:  Candidly, no, I don't believe that it is,
 6    Your Honor.
 7              THE COURT:  Why isn't it?
 8              MR. MASSEY:  Because first and foremost, that's how
 9    the parties set up this contract.  Whether it's refundable or
10    not refundable, this contract was redlined, it was negotiated.
11    The defendant was represented by very competent counsel,
12    Mr. Hayes.  That's just the way the parties set up the contract.
13              THE COURT:  Well, what then does the language in the
14    contract when it talks about "after the additional earnest money
15    deposit is made, whereupon the earnest money would be at risk
16    subject to the terms and conditions herein"?
17              I mean, that has to mean something.
18              MR. MASSEY:  Agreed, Your Honor.  I think perhaps the
19    defendant might be able to say, for example, if it was an
20    improper termination, maybe that somehow puts it at risk.  I'll
21    admit to you that I don't know the exact answer to the question
22    that Your Honor has posed.
23              THE COURT:  But I guess that's where I see the rub in
24    this case.  I mean, your argument, as I understand it going back
25    to your first point on is this a valid contract, it seems a lot
```

1    of that in your briefing, you said, well, it is because this

2    isn't just some indefinite option that we can just sit on their

3    property forever.  We have -- they have in their control -- the

4    seller has in their control the ability to make us fish or cut

5    bait, and that's the trigger notice.

6         And it seems to me for that argument to make sense --

7    I think it's a persuasive argument, and I think that undermines

8    a lot of what they're saying about this being an indefinite

9    option -- the trigger has to have some teeth behind it.  And I

10   thought the teeth behind it was that language that said that the

11   money's now at risk.

12        And so you've made a decision.  You're going to move

13   forward, irrespective of what happens in the inspection period,

14   and you put another $200,000 as the consideration for that.  Why

15   is that not the proper interpretation?

16        MR. MASSEY:  Well, to put this into context, Your

17   Honor, if you go to page 7 of Addendum A to the contract, one of

18   the things that would occur if this contract were to be

19   terminated is that is says -- and this is the last paragraph at

20   the bottom of Section 4 -- is that on termination of the

21   agreement, the buyer would agree to provide the seller, without

22   cost, copies of any and all inspection reports, studies,

23   surveys, appraisals, environmental and geological studies,

24   development plans, the party reports, similar due diligence

25   documentation obtained by buyer in connection with the property.

```
 1          And so I understand what Your Honor's asking, but I
 2   think it needs to be taken into context, that it's not like this
 3   is just a -- something where there's no benefit that could
 4   inure -- potentially inure to the defendant.  They get all those
 5   documents under the contract.
 6          THE COURT:  And so that would be your argument, that
 7   their consideration for you tying up the property for as long as
 8   it takes to get approvals is that if you walk away from the
 9   contract, they get all of the work that your client did up to
10   that point?
11          MR. MASSEY:  It's part of it, and that's what the
12   parties negotiated and the parties agreed to.
13          THE COURT:  I guess that is -- I'm surprised to hear
14   that argument because, again, reading your briefing, I thought
15   that it seemed like the trigger -- you put a lot of weight in
16   the trigger as their control to ensure that this didn't just go
17   on forever, and it sounds like that's not the case.
18          MR. MASSEY:  Well, I think that's exactly what the
19   trigger notice was for, Your Honor, because it doesn't go on
20   forever.  There's the 24-month deadline.  And so there is no
21   scenario that I could envision where this goes on forever.
22          THE COURT:  So where are we, then, if I determine that
23   the contract was valid from the outset, they properly sent the
24   trigger notice, which you've responded to and said we want to
25   move forward with the contract, you're telling me that that then
```

1    kicks in this 24-month period.  We're probably a year, 18 months

2    into that now.  So where does that leave us?

3              MR. MASSEY:  Our position would be that the 24-month

4    period, the postinspection period, would be from the date of the

5    judge's ruling, from Your Honor's ruling.  The reason behind

6    that is the defendant -- this has been stuck in the mud since

7    July 2023.  There has not been able to be any action at all

8    taken by my client in furtherance of the property.

9              There's even that December 1 letter.  I refer to it as

10   the cease and desist letter where they said, in no uncertain

11   terms, plaintiff-buyer, you are not authorized to make any

12   representations about this property.  And so that just

13   reinforces the fact that my client has necessarily been stuck in

14   limbo, could not take any actions whatsoever as confirmed by

15   that December 1 letter that's in the record.

16             THE COURT:  But that would be an equitable

17   determination of some sort.  There's nothing in the contract

18   that says these time periods are tolled pending litigation, I

19   assume.

20             MR. MASSEY:  Agreed, your honor.  I think that would

21   probably be best characterized as equitable remedy.

22             THE COURT:  Well, we'll talk about that at the end of

23   the process.

24             I guess the other thing that I'm struggling with here

25   is this inspection period had a purpose, and the purpose was for

1   you to make a determination as to whether you -- and when I say

2   "you," I mean obviously the buyer.

3         MR. MASSEY:  Yes, sir.

4         THE COURT:  -- whether the buyer could do with the

5   property what they wanted to do with it.  And -- but it also was

6   tied to approvals, and so that seemed to contemplate that you

7   would be not only doing all these meetings and flying around and

8   talking to people to do the groundwork but also making some

9   diligent -- I think there's where the FAR/BAR comes in, there's

10  a diligence requirement in there -- making some diligent effort

11  to close the inspection period out by getting the approvals.

12        And so how do I harmonize the fact that it appears to

13  be undisputed you were doing something?  But you weren't, until

14  I think October, November of 2023, or maybe even if we date it

15  back to May of 2023, you really weren't doing anything to get

16  the approvals.  How I do harmonize that?  Is that a factual

17  dispute?  Is that something I can resolve as a matter of law?

18        MR. MASSEY:  I think you can resolve it as a matter of

19  law, Your Honor.  Some of the uncontested testimony relates to

20  the fact that, in my terms, there were issues with getting the

21  utilities, in the sense of the sewer.  There was discussions

22  about package plants, discussions about building new facilities

23  when they come online, prepayment of fees.  There's all that.

24  And I don't want to belittle it, but all those details in the

25  background that there's no dispute that my client was trying to

1  work through.

2        What the contract does give him is it gives him the

3  ability to take all those steps and to inspect it.  And I'm

4  going to quote from Section 4 of Addendum A to determine the

5  suitability for purchase in buyer's sole discretion.  So that's

6  exactly what my client was doing, which is determining the

7  suitability for purchase.

8        THE COURT:  I think what the seller focuses a lot on

9  is the undisputed testimony from the city people that until you

10  make application, this is all just discussion.  We can't give

11  you an answer, we can't lock you in to water and sewer until you

12  make an application.

13        And how does that play into it given the undisputed

14  fact they didn't make an application at any point, they just had

15  these discussions and they kept being told:  We think we may be

16  able to get it to you, we promise we'll get it to you, we're

17  probably going to get it to you, but until you make an

18  application, we can't guarantee that you're going to be in the

19  queue.

20        MR. MASSEY:  And the answer to that, Your Honor, is

21  that the contract allows the buyer to close even without sewer.

22  So he can still move forward, he can still close, he can still

23  take down the property without the sewer.  And so these are just

24  protections that inure to the buyer's benefit under the contract

25  can still close without those.

1        We dispute any notion that he was sitting back, not

2   doing nothing.  I think the facts amply bear that out.  But the

3   fact of the matter is that he was taking what he believes were

4   the due diligence steps to determine the suitability for

5   purchase in his sole discretion against the context of there is

6   no requirement that sewer needs to be supplied to this property

7   in order to close.

8        THE COURT:  But it seems like the availability of

9   water and sewer is the kind of big kicker throughout the various

10  points, throughout the closing, throughout the inspection

11  period.  It seems like that's what the biggest concern was

12  from -- I don't want -- that's what the contracting parties seem

13  to think the biggest concern was.  They said, you know, you

14  need -- you can do all these inspections, and the closings have

15  opt-outs if you don't have water and sewer.

16       So it seems like that was what -- the important thing

17  to get certainty over was.  Am I misreading the contract and the

18  testimony?

19       MR. MASSEY:  Not at all, Your Honor.  Sewer, utilities

20  is critically important.  This is over a thousand acres of just

21  vacant, undeveloped land.  There's no sewer.  There's no

22  utility.  The plan is to put in a master plan to development

23  project.  So you think of houses condos, stores, commercials, so

24  on and so forth.

25       And so those protections that are in place to protect

1    the plaintiff, those can be waived.  He doesn't have to close

2    with sewer.  If the fact pattern were different, perhaps our

3    argument might change.  In other words, if the contract says the

4    only way you can close this contract is upon obtaining sewer,

5    perhaps my argument might change, Your Honor, but he can still

6    close even without that.

7              THE COURT:  And I guess that, you know, we keep coming

8    back to this trigger and the -- what enabled the defendant to --

9    or, excuse me, the seller to send the trigger was their

10   determination that some time period, 150 days, had passed and

11   that you're not likely to get water and sewer within 90 days.

12   I'm probably oversimplifying it, but that's kind of how I read

13   it.  Is that a fair simplification?

14             MR. MASSEY:  That's fair.

15             THE COURT:  And so that then happens.  So the seller

16   realizes this is not going to happen within the next 90 days,

17   they send the trigger notice, and it seems to me that by

18   exercising the trigger notice, putting that money at risk, per

19   the contract terms, you're essentially saying I'm closing

20   without water and sewer, or if I don't, I'm giving up my

21   $250,000.  Why is that not the best reading of this contract?

22             MR. MASSEY:  I don't necessarily disagree with Your

23   Honor's reading.  I think that that could be a potential reading

24   for it.  I do think that's not a determination the Court needs

25   to make for what we have here in this declaratory action

 1  judgment, which is to determine that it is a valid, binding

 2  contract, rights and obligations apply.  Even if the trigger

 3  notice is effective, we're now in the postinspection period.

 4          THE COURT:  The other thing from a factual

 5  perspective, it seemed like there was a minor variant between

 6  what the plaintiff's representative -- or, excuse me.  Let me

 7  try to use this.

 8          The buyer's representative and the seller's

 9  representative were saying about the length of time that it took

10  to get a project like this off the ground, and I think they both

11  said -- Mr. Hayes and Mr. Carll kind of both said two to three

12  years is about how long it takes for something like this to go.

13  But it seemed like there might have been a slight difference

14  between that period being contract to approvals versus contract

15  to building.

16          Did I -- did I see something that wasn't there or

17  was -- if I'm right about those differences, is a material fact

18  in dispute?

19          MR. MASSEY:  I don't believe it's a material fact,

20  Your Honor, and let me tell you exactly why.  Because both

21  parties testified that there is a reasonable time period that

22  applies.  If this matter were to go to trial, perhaps that's

23  something that -- the reasonableness of that time period could

24  be something the Court would need to consider from

25  Ms. Hughes-Neel's testimony, the city planner.  Even she said --

1   and I'm paraphrasing what her testimony was -- that essentially

2   even if things -- steps are done as quickly as possible, we're

3   still looking at over a year to get there, in order to get to

4   the development order to get all the applications in, do all the

5   pre-meetings, the engineering, and so on and so forth.

6        THE COURT:  And the other thing that I was a little

7   bit confused by is, you know, as I understood the buyer's,

8   Mr. Carll's, testimony in essence was I wasn't going to spend

9   all the money I needed to spend -- 3 to 5 million, I seem to

10  recall -- to do everything necessary to put in applications

11  until I had some assurance from the city that water would be

12  available by the time this was all -- I was ready to start

13  turning dirt.

14        Is that a fair summary of what he said?

15        MR. MASSEY:  It's roughly fair, Your Honor.  I mean,

16  I'm not disagreeing.  It is against the context of that when

17  this property was placed under contract, when the contract was

18  signed, negotiated, executed, the full thousand acres, it didn't

19  have the sewer.  And so I think that it does have to be read

20  against that context of any, what I would consider reasonable

21  trepidation, about paying for something that doesn't exist.  Did

22  that change at some point?

23        THE COURT:  And that seems completely -- a reasonable,

24  rational actor would proceed in that way.  But I guess what it

25  begs the question to me is, so he gets information that provides

1  him the level of comfort that he needs to begin spending that

2  money in I think May, October, one of those two dates I think

3  was the testimony, and then, you know, an application -- I guess

4  it was in May-ish when they got the email saying that it's going

5  to be ready.

6          October they get some confirmation that it will be

7  available for sure by June of 2024.  At that point he's ready to

8  spend the money.  And then what happens next is this application

9  kind of gets -- might take offense to it -- kind of get slapped

10 together, sent to the defendant, and say, Hey, we need your

11 signature on it -- sent to the seller, say, Hey, we need your

12 signature on it.

13         I guess I'm confused by was that a real sincere effort

14 to begin the process, or was that something that we knew this

15 dispute was going on so we're making a surficial effort to do it

16 if -- and the reason I ask is because if it's going to take 3 to

17 $5 million to actually begin doing what you need to do to get an

18 application put together, kind of throw it together on just a

19 form, it seems inconsistent with the idea that you needed to

20 wait so long to throw it together on a form.

21         See what I'm asking?

22         MR. MASSEY:  I think I do, Your Honor.  It was a

23 sincere effort to move the project forward.  It's against the

24 context of going back to July, there was no communication

25 between the parties except for the attorneys going back and

1    forth.  And so it absolutely was a diligent, sincere effort to

2    move the contract forward to close under the terms of the

3    contract.

4            THE COURT:  And so I guess why couldn't that have been

5    done months ago, years ago if all it took was 30 days to put an

6    application together, that I guess didn't have much of what was

7    going to ultimately be needed, why couldn't that process have at

8    least begun much longer ago?

9            MR. MASSEY:  I would be speculating.  I don't have a

10   crystal ball as to why it wasn't done earlier.

11           THE COURT:  There's nothing in my record explaining

12   that to me.

13           MR. MASSEY:  I will say there were very significant

14   issues with getting sewer to the property.  And it went on a

15   continuum where there were certain solutions that were proposed,

16   rejected, explored different options, different avenues.  And so

17   that's all against the context of Mr. Carll, on behalf of the

18   plaintiff, is trying to figure it out through this entire

19   process, finally got to a point where he felt confident about

20   the ability to move forward.

21           THE COURT:  And what would you say the record would

22   tell me that point was?  Was it May?  Was it October?  When was

23   that point?

24           MR. MASSEY:  I'd have to go back into the records,

25   Your Honor.  At some point there was more of -- as I'll phrase,

1   more of an express indication from the City of Freeport that

2   sewer would be available.  I would have to go through the

3   transcripts to tell Your Honor exactly where that would be, but

4   I just don't have that in front of me.

5          But there was a trigger point at some point where he

6   maintained that confidence.  And, Your Honor, I would say that's

7   exactly why the trigger notice was in place because the

8   defendant believes that, Hey, you're not doing anything, you're

9   not doing enough, whatever it might be, we're tired of this

10  languishing around.  Then they send the trigger notice, and it

11  forces the opportunity to decide whether to close or not.

12         THE COURT:  Right.  I mean, it seemed like what

13  happened here -- and maybe this is outside the record, but it

14  seemed like what happened is the seller got the same level of

15  comfort that you got that sewer was going to be available at a

16  time certain, which is more information than they had before.

17  And all of a sudden they realize they got somebody better may be

18  out there -- I remember some of that in the litigations --

19  somebody better out there may be interested in the property.

20  And so, you know, they told you either fish or cut bait or we're

21  going to sell it to somebody else -- now that everybody knew

22  that sewer was going to be available in June of 2024.

23         Is that reading too many tea leaves?

24         MR. MASSEY:  I don't think it's tea leaves.  I think

25  that Mr. Hayes, the corporate representative for defendant,

1    testified that there was a proposed joint venture, discussions

2    that were going on in exactly that time frame, which -- and I'll

3    quote -- he said "would absolutely make more money as compared

4    to the contract that my client signed."

5            THE COURT:  All right.  Well, what else do you want to

6    tell me that I've interrupted you in?

7            MR. MASSEY:  Your Honor, I will say I think both sides

8    have briefed this matter within about an inch of its life.  So

9    I'm happy to answer further questions that you might have.  I'm

10   happy to carry along.

11           THE COURT:  So the long and the short of it, from your

12   perspective, is that the -- that my interpretation of the

13   trigger notice that -- at least my preliminary interpretation of

14   the trigger notice that it was the fish-or-cut-bait point at

15   which your $250,000 was at risk is not an unreasonable reading

16   of it, but it's not a necessary reading to make the contract

17   valid?

18           MR. MASSEY:  Without a doubt, Your Honor.  Without a

19   doubt.

20           THE COURT:  Okay.  What else do you want to tell me?

21   And I'll hear from Mr. Sickler in a moment and we'll bounce back

22   and forth until everybody's tired of talking.

23           MR. MASSEY:  Thank you, Your Honor.

24           I mean, essentially just, Your Honor, at bottom, this

25   is how these real estate deals work.  They use the FAR/BAR

1  contract.  Granted, they supplemented it with a bunch of

2  different language, but it doesn't change the basic fundamental

3  principles of how real estate deals work, which is execution,

4  due diligence, and then close.

5       THE COURT:  Let me ask one other question.  The -- you

6  would agree, I would assume, that this contract could have been

7  better -- there could have been dates and times that were -- we

8  wouldn't have this dispute had they been in there.  In other

9  words, if they had said you must make application within 180

10  days after this contract is executed, you must close within 240

11  days after this contract was executed -- if we didn't tie things

12  to approvals which are out of everybody's control, other than

13  the application, this could have been done better?

14       MR. MASSEY:  I will concede that there were different

15  ways that this contract could have been written, Your Honor,

16  such as, for example, one with a timeline or some with dates

17  certain for those types of matters, but it wasn't.

18       THE COURT:  Or the inspection period shall not last

19  more than 18 months.

20       MR. MASSEY:  Perhaps.  If the parties chose to write

21  it that way, I still think it would be given full force and

22  effect.

23       THE COURT:  But your argument is the absence of a

24  definite time period for the inspection period doesn't

25  invalidate this contract because, at worst, I could interpret it

1    as a reasonable time?

2         MR. MASSEY:  Without a doubt, Your Honor.  There's two

3    prongs to that.  Number 1, there's the trigger notice.  So there

4    is absolutely the ability to put the endpoint from the

5    defendant.

6         And then Number 2, even if not, so if the Court set

7    aside the trigger notice and just read it completely out of the

8    contract, then it just becomes a fact issue for what's a

9    reasonable determination of time at which point the witnesses

10   have testified consistently at least two to three years.

11        THE COURT:  And if -- okay.

12        MR. MASSEY:  In other words, Your Honor, that goes to

13   validity of the contract so the bottom doesn't fall out.  It

14   doesn't cease to be a contract, especially when the parties took

15   advantage of or moved forward as if it were an existing contract

16   for two years.

17        THE COURT:  And on that point, you made an

18   estoppel-type argument.  I'm not sure I fully understood it.  I

19   guess I wouldn't need to get to that point if I found the

20   contract to be valid from the outset, but help me understand

21   what your estoppel argument was.

22        MR. MASSEY:  Absolutely, Your Honor.

23        This was raised in response to what we don't believe

24   is a -- this was raised in response to defendant's position,

25   which is this contract never existed.  And so fundamental

1   fairness principles certainly apply here under the equitable

2   estoppel reasoning, which is that the seller represented, yes,

3   this is a contract in a variety of different ways.  They allowed

4   plaintiff to take all sorts of different steps, you know, flying

5   around, strategy meetings, session meetings.

6           And then now they're reputing the existence of the

7   contract from the very beginning against the context of they

8   took advantage of their protection under the contract which was

9   by attempting to send the trigger notice.  So you can't have it

10  both ways, Your Honor.  You can't say this contract never

11  existed while at the same time hiding behind protections in the

12  contract, the trigger notice, while at the same time saying --

13  actually, two years ago at that point.  When they sent the

14  trigger notice two years ago, it actually was never a contract

15  in the first place.

16          THE COURT:  Would it have been different if instead of

17  sending the trigger notice, you know, they get your package of

18  applications in November and you say, Hey, sign these, and they

19  say no, we're not going to do it because we don't think we have

20  any obligations, this was not even a real contract.  Would that

21  have -- would you have an estoppel argument there, or is the key

22  from your perspective the fact that they exercise a right under

23  a contract they say now doesn't exist, never existed, or never

24  was valid?

25          MR. MASSEY:  So -- sure.  Just to make sure I

 1    understand the hypothetical.  So is Your Honor asking if the

 2    trigger notice was never taken --

 3            THE COURT:  Right.

 4            MR. MASSEY:  -- advantage of?

 5            THE COURT:  The trigger notice never -- they never

 6    took any action under the contract.  All they did is sit around

 7    for two years and let you go meet with people and talk to people

 8    as if there was a contract, but they didn't do anything under

 9    the contract.  And when it came time for them to do something

10    under the contract, cooperate with the applications, they

11    said -- they assert the claim they do now which this contract

12    wasn't valid from the outset.  Would you have an estoppel

13    argument still, or is the key the fact that you have here the

14    use of the trigger notice?

15            MR. MASSEY:  The trigger notice is certainly

16    paramount.  I do think an estoppel argument would still apply.

17    Two different things.  One is case law which I think would

18    probably be applied here.  One is just a fact pattern in the

19    contract.  The fact pattern in the contract is that if the --

20    there's still a benefit that inures to the defendant, which is

21    they contracted to get rights to obtain the studies, surveys, so

22    on and so forth, everything that's listed in the contract.  So

23    there's absolutely a benefit that flows that way.

24            The case that I wanted just to draw your attention to,

25    and I don't know that it's necessarily directly on point in the

```
1   holding, but I think that some of the language certainly
2   applies.  I think this was actually cited in defendant's brief.
3   It's the Wright v. Seaton [sic] case.  This dealt with the
4   covenant not to compete in an employment context.  So there's a
5   distinction right there.
6           But what the Court writes about is it says that
7   "consideration" -- so benefit -- "can be satisfied by any act of
8   labor, detriment, or inconvenience sustained by a plaintiff at
9   defendant's express consent."
10          And that's here.  It's the trips, it's the planning,
11  it's the time, it's the money, everything that's spent going
12  into this property.  And so that's another way to look at it as
13  well, Your Honor.
14          THE COURT:  And the one last thing I'll ask you about,
15  I think in your brief you talk about the seller's failure to
16  provide you a title commitment in the context of the validity of
17  the trigger notice I think.  And I guess I'm struggling to
18  understand how the two of those have anything to do with each
19  other.
20          MR. MASSEY:  Sure, Your Honor.  So the title
21  commitment was due within 15 days after execution.  It wasn't
22  provided.  It -- it -- there's -- it seems difficult to imagine
23  a position where a seller can force a buyer to make a decision
24  to purchase property when even here today in this courtroom, we
25  still don't have that title work.  In other words, we can't even
```

 1   verify just what exactly is owned, what's free of liens, so on

 2   and so forth.

 3          And so that just -- that's an unreasonable -- our

 4   position would be it would be an unreasonable outcome where a

 5   defendant can hide behind the protection of the trigger notice

 6   to say essentially, Hey, you haven't done enough due diligence

 7   or you haven't done it correctly or we're dissatisfied with it,

 8   while at the same time foreclosing the buyer.

 9          THE COURT:  And that sounds like a very logical

10   argument, but I guess the two questions I have about it was you

11   did, though.  You exercised your right under the trigger

12   agreement without having that, number one.

13          And number two, you knew for probably close to a year

14   at that point that you hadn't gotten the title commitment and

15   you had made no effort to say, Hey, I haven't got -- well, I

16   don't know if you made no effort, but certainly it doesn't

17   appear that there was any urgency to get the title commitment if

18   that was something that was important to you.  They had an

19   obligation to provide it within 15 days.  They hadn't provided

20   it.  You could have said, I got your trigger notice, thank you

21   for that, but you can't force me to exercise it until -- why is

22   that not a red herring at this point?

23          MR. MASSEY:  I understand your -- the point, Your

24   Honor -- and my exhibits are on the table.

25          My recollection is that when the trigger notice was

1   responded to, that counsel for buyer repeated the -- well,

2   raised the request of title examination.

3           And, Your Honor, may I step back and get my binder?

4           THE COURT:  Yeah, go ahead.

5           MR. MASSEY:  I want to make sure I'm quoting this

6   accurately.

7           THE COURT:  Yeah, it is included in there.

8           MR. MASSEY:  And so that's first and foremost, Your

9   Honor, is that is included instead --

10          THE COURT:  But I don't think -- I don't read that

11  letter, though -- it's on the second page of the letter, the

12  middle paragraph.  I don't read that letter as saying as a

13  result of that, we have no obligation to respond to your trigger

14  notice.  In fact, I mean, I think an argument could be made,

15  maybe I'll hear from Mr. Sickler, that you waived that as a

16  precondition of responding to the trigger notice by responding

17  to the trigger notice.

18          How do you respond to that argument that hadn't --

19  maybe yet to be made?

20          MR. MASSEY:  Two things.  Number 1, that requirement

21  has not been waived.  There's nothing between the parties that's

22  waived that --

23          THE COURT:  I agree.  For ultimate closing, you got to

24  have that, but I'm talking about -- we're talking in the context

25  of the trigger notice.  You raised that argument as a basis for

1    saying the trigger notice wasn't valid.  And I guess my

2    question -- my two points are, factually, I don't think you've

3    raised that until -- you certainly didn't raise that before you

4    responded to the trigger notice.

5        And so my question on waiver is not have you waived

6    ever getting a title commitment, but for purposes of the

7    validity of the trigger notice and your response to it, putting

8    your money at risk, why wasn't that waived by you saying, I know

9    I don't have -- in fact, affirmatively saying, I know I don't

10   have the title commitment at this time point, I still want to

11   move forward with my contract, and here's $200,000 that's now at

12   risk to show you that I really mean it.

13       MR. MASSEY:  Because it puts us in an untenable

14   situation if we do anything but that, which is respond to it,

15   put up the money.  And if we don't, if we just ignore it and

16   say, Hey, there's no title, then I would suggest that would be

17   the first thing you'd be hearing from Mr. Sickler, which is that

18   this no contract because --

19       THE COURT:  I mean, does it really?  I mean, I guess

20   you were -- "you," and, again, I'm saying the buyer -- was not

21   hesitant to file a lawsuit seeking a declaration that this

22   contract was still in effect.  If you had gotten the trigger

23   notice and said, I'm not going to respond to your trigger notice

24   until I have my title commitment which you had an obligation to

25   provide a year ago at this point.

1          And so -- and at that point they would say, you know,

2    thank you for your letter, we don't see the two as being related

3    to each other.  The contract is therefore terminated because you

4    haven't exercised your trigger notice.  There's your declaratory

5    judgment action or your breach of contract action or something

6    else.

7          Anyway, I don't know.  Maybe it's -- maybe I'm seeing

8    something that isn't there or maybe I'm seeing something that's

9    hard to respond to and --

10         MR. MASSEY:  No, you're -- Your Honor, you're bringing

11   up valid points.  You know, the contract has to be read in a

12   whole.  The due diligence phase is to determine in buyer's sole

13   discretion whether he's going to move forward.  It -- it's hard

14   to imagine a situation where any buyer, especially a property of

15   this magnitude, could ever make that decision without title.

16         The obligation is squarely upon the shoulders of the

17   seller to get the title.  They're therefore blocking the ability

18   for plaintiff to do due diligence which he's allowed and

19   authorized to do.  It's never been waived.

20         And I'll say just one of the things that I think

21   becomes amply demonstrated throughout the testimony, it's not

22   like Mr. Carll, the buyer, was sitting around doing nothing.

23   This is the hustle and bustle of trying to figure out can we get

24   this, can we do that, you know, what type of plan is going to

25   work.  Was there some sort of extra affirmative obligation for

1   him to reach back out and say --

2           THE COURT:  Yeah, let me ask one other question, then

3   I'll let Mr. Sickler argue.

4           There was some testimony in Mr. Carll's deposition

5   that he seemed to have a different interpretation of this

6   trigger notice than even you were advocating.  In other words, I

7   think -- I didn't understand it frankly, and I was going to give

8   you an opportunity to try to explain it to me.  But it was

9   something to the effect of that the purpose that the trigger

10  notice was used for here wasn't what it was really intended to

11  be used for.  Did you see that?

12          MR. MASSEY:  I saw it.

13          THE COURT:  And do you understand it?  Can you explain

14  it to me?

15          MR. MASSEY:  The defendant cited it in the brief, Your

16  Honor, and I would -- that -- Your Honor, that's just -- that's

17  a layperson's interpretation of what may or may not be included

18  in the contract.  There's all sorts of parol evidence, other

19  sorts of rules that would apply to that.  I think even if Your

20  Honor were to try to give some sort of credence to a layperson's

21  interpretation of what some might consider a convoluted

22  contract, it would have absolutely no bearing.  It certainly

23  doesn't show there's any meeting of the minds.  Whether he has a

24  subjective belief that a certain clause was included or not

25  included for this reason or that reason truly has no bearing.

1          THE COURT:  Right.  And that's -- okay.  So I can kind

2     of disregard his understanding of it and read it for what it is.

3     Is that what you just said?

4          MR. MASSEY:  I think we're looking at the contract,

5     Your Honor, I think a layperson's interpretation of why it may

6     or may not have been included really has no bearing on this

7     Court's decision.

8          THE COURT:  All right.  Well, let me hear what

9     Mr. Sickler has to say, and then we will go back and forth until

10    you-all run out of talk.

11         MR. SICKLER:  Good morning, Your Honor.

12         THE COURT:  Good morning.

13         MR. SICKLER:  Robbie Sickler for Freeport Partners.

14    They are the sellers of this property.  I wanted to begin by

15    addressing a couple of issues that Your Honor did raise just

16    before you start peppering me with questions as well.

17         I did want to make sure that the record was clear

18    because I don't want there to be any sort of after action

19    between the parties on this.  The testimony has been clear on

20    the part of my client, Your Honor, that there was never another

21    purchaser in play when the trigger notice was sent.  That was

22    part of the issues with the motion to compel that you may be

23    recalling that Judge Bolitho presided over.

24         We feel the testimony is eminently clear that at the

25    time that the trigger notice was sent and that the issues were

1  dealt with about water and sewer availability in May of 2023,

2  there was no buyer in play, there was no fraud or anything that

3  has been contended in --

4          THE COURT:  When did the new buyer come into play?

5          MR. SICKLER:  It is my understanding that the new

6  buyer did not come into play until August or September of 2023

7  after the trigger -- more than two months after the trigger

8  notice had been sent and more than a month -- excuse me, Your

9  Honor -- after the trigger notice had been responded to, that

10 this was something that happened subsequent to those issues, and

11 that the contract at issue that was discussed by Mr. Massey did

12 not even begin to form a bare-bones sort of rubric until the

13 December 2023 time frame.  All of those issues are post-trigger

14 notice in its entire framework.  And I just wanted to make sure

15 that was clear on the record --

16         THE COURT:  Okay.

17         MR. SICKLER:  -- that my client wasn't looking to

18 ditch this contract in favor of another.

19         THE COURT:  And I appreciate that.  It's not

20 ultimately necessary to any decision I have to make, but I

21 always when I look at a case, I try to see the bigger picture.

22         MR. SICKLER:  Certainly.

23         THE COURT:  And it seemed to me that the bigger

24 picture was that in the May through October time frame, it

25 became apparent to everyone -- buyer, seller, third parties who

```
 1   might be interested -- that sewer -- water and sewer was

 2   actually going to be available in the June of 2024 time frame.

 3          And it seems to me that that was what stimulated the

 4   trigger notice, it stimulated interest from other people.  It

 5   stimulated action on their part.  And that all makes sense to

 6   me, and I try to find circumstances that help things make sense.

 7   Is that -- putting the discrete timing together, is that -- or

 8   putting -- disregarding the discrete timing of things so as not

 9   to attribute anything, anybody, is that a fair understanding of

10   what's going on in the field around that time frame?

11          MR. SICKLER:  I think as a general description, Your

12   Honor, I think that's accurate.  I think from my client's

13   perspective, the way I would tweak that is simply that basically

14   23 months had gone by.  There had been a lot of discussion.  We

15   don't dispute that there had been a lot of discussion back and

16   forth with the City of Freeport on some of these issues.  And

17   ultimately my client didn't feel that the buyer was actually

18   taking any adequate steps to actually move the contract forward,

19   to do the due diligence period, which I think we have aptly

20   characterized as sort of a never-ending option contract.

21          They took it upon themselves to reach out to the City

22   of Freeport to get some of these determinations.  I don't have

23   the exact numbers in front of me, but I believe my client is the

24   one who ultimately reached out to the planning department for

25   the City of Freeport, got those updates, provided those updates
```

1    over to the buyer and said, Hey, what are you doing?  I know

2    there's testimony --

3         THE COURT:  And I get it, and maybe that will bring us

4    back into what I think we need to talk about.  And I get it from

5    the seller's perspective.  The property's been tied up --

6    whether another buyer's out there or not, the property has been

7    tied up for an extended period of time, and it's perfectly

8    reasonable for them to want to have the contract -- the party

9    who's got the property tied up, fish or cut bait.  And I think

10   that takes us right back into the trigger notice.

11        That trigger notice could have been sent at any point

12   after 150 days of the effective date of the contract, right?

13        MR. SICKLER:  Pursuant to the terms of the contract, I

14   believe that's technically accurate, other than the fact that

15   there are some limitations that are in place.  Specifically, it

16   says that the seller has to determine in its reasonable

17   discretion that the city approval is not available within the

18   next 90 days or it would be --

19        THE COURT:  Right, that's a phone call.  That's a

20   phone call to the planning department saying, Hey, you think

21   we're going to have water and sewer at our property in 90 days?

22   They'll either say yay or nay or we can't tell you until you

23   apply or whatever.  So it seems to me that that's an easy

24   determination to make in your reasonable discretion.

25        So for all intents and purposes, this trigger notice

1    could have been sent long before it was.  I understand why it

2    wasn't, and I think the reason why it wasn't is because your

3    client testified he understood that this is a lengthy due

4    diligence period, right?

5         MR. SICKLER:  I think he understood that it would be a

6    lengthy due diligence period.  I think what he didn't understand

7    was how little was being done during the due diligence period,

8    that there were -- as sort of shown in the November 16th

9    correspondence that you referenced earlier about whether or not

10   it was a good faith effort to actually move forward with the

11   contract, that it appeared based on the list of documents that

12   had never even been begun to be obtained, that no real due

13   diligence was ever actually being performed.

14        So my client was -- I don't mean to use an ugly term,

15   but sort of fooled into believing that things were going on

16   because there was a lot of sort of shuffling of papers and

17   activity happening in the terms of flying down or meetings and

18   what have you and believing that the cause was actually being

19   advanced when, in fact, it was not.

20        The contract does have some specific time frames.  The

21   only thing I would add to what Mr. Massey added is it's not

22   really a two-year time frame.  It's really almost a 36 -- not

23   36, excuse me.  It's almost a three-and-a-half-year time frame

24   because the two-year time frame post close of the inspection

25   period is simply to close on takedown number one.  And then

1    it -- and then the closing dates in the contract roll --

2         THE COURT:  I guess my point on that is does that

3    really matter?  I mean, it seems to me that whatever the -- if

4    the parties negotiated a two-year closing or a 20-year closing,

5    I don't think that would make the contract invalid.

6         MR. SICKLER:  Your Honor, it goes to our argument that

7    time was of the essence and that that time -- time being of the

8    essence was read in and that there was a breach on the part of

9    the buyer to fail to move forward in a diligent fashion with the

10   due diligence period on a contract that did have time frames in

11   place and that that preemptive breach negates anything that my

12   client may have done in terms of sending an invalid trigger

13   notice or otherwise being obligated to move forward with the

14   contract.

15        THE COURT:  I guess I'm -- that's one point I'm

16   confused about.  This is a declaratory action.  It's not a

17   breach of contract action.  It's not a cross-declaratory action.

18   I can only determine was this a valid contract, trigger proper.

19   Where are we in the state of things?  I can't -- how does the

20   breach play into this at all?

21        MR. SICKLER:  It's an unclean hands argument, Your

22   Honor.  You can't get inequity if you do not approach inequity.

23   If you show up to the Court looking for an equitable remedy, you

24   have to have done equity yourself.  If you have breached the

25   contract, you're not entitled to an equitable remedy.

1          THE COURT:  What terms of the contract did they

2    breach?

3          MR. SICKLER:  They failed to move forward with any

4    diligence under the time-is-of-the-essence provisions to

5    actually move forward with the project to get those city

6    approvals.

7          THE COURT:  How can I determine that as a matter of

8    law?  I mean, because it's undisputed they were doing something.

9    I know it wasn't as much as your client thought they were doing,

10   thought they should have been doing, but there were no time

11   frames saying you have to do this by this date, this by this

12   date that they breached.  They were doing something.  So how can

13   I say as a matter of law they weren't exercising due diligence

14   in the face of seemingly uncontradicted testimony that this is a

15   two- to three-year due diligence period?

16         MR. SICKLER:  I would dispute, Your Honor, that it's a

17   two- to three-year due diligence period.  I believe Mr. Hayes

18   testified that it's a two- to three-year from execution of

19   contract to getting out of the ground.

20         As we have it standing here, it was going to be more

21   than a three-year due diligence period.  I don't think the

22   parties contemplated that at all.  And to your point, yes, there

23   was activity happening but none of that activity actually

24   directly furthered the contract.  It didn't move anything

25   forward.  There are no deliverables for the consideration that

```
1    Mr. Massey referenced.  There are no deliverables that have been
2    actually provided or even prepared.  The November 16th letter
3    shows that.
4         So, yes, activity was occurring, but it was a
5    functionally meaningless activity, Your Honor, that wasn't
6    advancing the contract.
7         THE COURT:  Let me ask this, because it seems to me
8    that whatever happened up until the point of the trigger notice
9    being sent is background information, but that was the point at
10   which your client said, all right, I'm tired of waiting, fish or
11   cut bait and put more money up if you're going to go forward.
12   Why doesn't that opportunity that you took advantage of
13   eliminate this this-is-just-an-indefinite contract?  You've now
14   got $250,000 in your hand if they walk away.
15        MR. SICKLER:  Your Honor, I don't necessarily disagree
16   from the standpoint of I -- I would argue that the $250,000 is
17   at risk per the contract.  But I think that the trigger notice
18   was used simply because it was there.
19        Dana Matthews, who was counsel before me who
20   represented the seller on this, made clear in his correspondence
21   that the trigger notice was being sent really as a full
22   termination of the contract.  They were failing to move forward,
23   they were failing to advance the contract in any fashion, and
24   that the buyer considered the contract to be terminated.
25        THE COURT:  I don't think that's what the -- I don't
```

1    think --

2          MR. SICKLER:  That's not what the trigger notice says,

3    Your Honor.  That would have been the August follow-up.

4          THE COURT:  I don't know if I care about any of that.

5    It seems to me that you sent a trigger notice, and then you sent

6    a letter on the -- or an email with the copy of a letter on the

7    17th, Mr. Hayes did, that essentially said we sent you a trigger

8    notice, you haven't responded, contract is terminated.  I mean,

9    again, it turns out he was wrong on his timing, but that's the

10   reason that the contract was terminated.

11         And whatever happened between lawyer communications

12   after the fact is just backfilling the hole that was dug.  I

13   mean, that -- you've -- that was the reason you gave for

14   terminating the contract.  Not because you breached, not because

15   you did anything else.  It's because you didn't respond to the

16   trigger notice timely.  And you're wrong on that, but why

17   should -- why is any of that other stuff really important?

18         MR. SICKLER:  Well, again, Your Honor, they're here on

19   a declaratory judgment action.  I understand Your Honor has

20   characterized it as background, but we view the contract to have

21   been breached.  I understand it was an inartful correspondence

22   using the trigger notice as the termination, but my client's

23   position as we stand here today is that the client -- is that

24   the contract was being terminated through that process for

25   inaction by the buyer.

1    THE COURT:  Okay.  Well, I don't know if they can get

2    that.  I mean, it seems to me that if you want to terminate --

3    if you want to claim -- there's nothing in the contract that

4    gives you a unilateral right to terminate it if in your

5    determination they haven't done enough.  Correct?

6    MR. SICKLER:  I would agree that the mechanism in this

7    particular contract would be the trigger notice that was

8    ultimately sent.

9    THE COURT:  And so your remedy -- if you truly wanted

10   to do what you say you did, which is say we have terminated this

11   contract because you breached it, is to send that letter and say

12   we no longer intend to perform under this contract based upon

13   your breach, period, end stop, and wait for the breach of

14   contract lawsuit to come, correct?

15   MR. SICKLER:  Yes, Your Honor.  I think that that is

16   one mechanism to do that.  I believe at this point that has

17   occurred.

18   THE COURT:  Okay.  I'm not sure I share that view, but

19   we'll see where that ends up.  I mean, certainly that's what all

20   the lawyer communications have said, and I guess I'm still

21   struggling to understand what I'm not looking at a breach of

22   contract action, the only way that comes in here, it sounds like

23   from what you're arguing to me, is in evaluating whether they've

24   come to court with clean hands or unclean hands.  I can't make a

25   factual determination that they breached this contract, can I?

1          MR. SICKLER:  Not -- I suppose Your Honor probably

2     can't make that determination based on this other than the

3     reasonable time frames arguments that have been raised by both

4     sides.  I think that a reasonable time frame in this contract

5     does not permit for a 28-month or almost 38-month due diligence

6     period which is what's being suggested, given the fact that

7     nothing was done until month 28 with the November 16th

8     correspondence and then ultimately would be another year with

9     the modification of the PDP.

10          THE COURT:  So what would your -- what is your

11     position if -- if I determine that this trigger notice properly

12     sent, timely responded to, additional money was put up, are we

13     in the inspection period still?  Are we out of the inspection

14     period?  Where are we in the contract at this point?

15          MR. SICKLER:  Under that particular hypothetical, Your

16     Honor, we would be out of the inspection period.  We would be on

17     the sort of glide path to close, if you will.  There would be

18     the takedown periods.  Those time frames are obviously set forth

19     in the contract.  I believe there's a maximum two years before

20     takedown one, and then a minimum 18-month -- or I think 180

21     days, excuse me, between each subsequent takedown of a quarter

22     of the property.

23          THE COURT:  And you're not happy without that outcome,

24     correct?

25          MR. SICKLER:  My client is not happy with that

1    outcome, Your Honor.

2        THE COURT:  Mr. Massey, your client is not happy with

3    that outcome either, correct?

4        MR. MASSEY:  My client would be very happy if it were

5    declared by the Court to be an executory contract.

6        THE COURT:  The declaration would be, under my

7    hypothetical, would be trigger notice was properly sent;

8    properly responded to; the $250,000 is at risk; and now we're,

9    as Mr. Sickler said, on the glide path to closing.

10        MR. MASSEY:  I wouldn't necessarily say that to be

11    unhappy with it.

12        THE COURT:  Okay.  All right.  I'm trying to come to a

13    resolution that everybody's unhappy with, which means I've got

14    the right resolution.

15        MR. SICKLER:  I would want to make clear we're

16    probably unhappy with it for different reasons.

17        THE COURT:  I agree.  Unhappy for different reasons

18    but -- which again makes me think I may be sniffing around the

19    right tree.

20        All right.  So tell me why the -- why you think this

21    was not a valid contract from the get-go.

22        MR. SICKLER:  As we briefed, Your Honor, the biggest

23    issue is -- I understand Your Honor has sort of said, Hey, at

24    150 days you can pick up the phone and make this phone call.  We

25    believe in good faith there is a reasonable effort standard or

1    reasonable belief standard on our part and that we have to be

2    acting in good faith.  We just can't simply say at 150 days

3    we're shutting this down.  But if that was the intention between

4    the parties that it would have said the due diligence period is

5    150 days.

6         Everybody knew the status of things on the ground.

7    However, the simple fact of the matter is -- and plaintiffs have

8    conceded in their briefing that there is literally no obligation

9    for them whatsoever to move this contract forward.  There is no

10   obligation.  I believe it was pointed out in the reply brief --

11        THE COURT:  Well, I guess -- and maybe I'm -- maybe

12   I'm just missing something.  But it seems to me that you're

13   right about that to a point that this -- this due diligence

14   period was in their sole discretion to figure out if it was

15   suitable for their purposes, and it didn't end -- the 150 days

16   or 120 days really isn't kind of a real number.  It didn't end

17   until they got the approvals and they were in control of when

18   they applied for the approvals.

19        So in many respects, I think you're right that this

20   could go on forever, but it includes this trigger period, or

21   trigger notice, that's within your control to say, okay, fish or

22   cut bait, put up more money.  Why doesn't that eliminate that

23   indefinite option situation?

24        MR. SICKLER:  I think it doesn't eliminate it unless

25   you take into account sort of the facts on the ground.  In a

1  particular situation here if you just read this by its technical

2  writing, if water and sewer were available and plaintiff

3  simply -- or the buyer simply decided not to move forward as

4  quickly with due diligence, he could arguably tie up the

5  property because -- to make that phone call at 150 days, if the

6  City of Freeport says yes, there's water and sewer, we don't

7  have and a reasonable expectation that water and sewer can't be

8  obtained, and the due diligence period continues.

9          Under that sort of hypothetical, the due diligence

10  period could be five, six, eight years.  And the buyer is then

11  able to tie up the property for an indefinite period on a

12  $50,000 refundable deposit that ultimately if they just finally

13  decide, you know what, I just don't like this property anymore,

14  they can walk away after six or eight years and my client never

15  has the reasonable belief to actually utilize the trigger notice

16  which does create an indefinite option.

17          THE COURT:  Well, but none of that happened.

18          MR. SICKLER:  It did not.

19          THE COURT:  And there was something that that -- oh.

20          Mr. Massey also makes the argument that the

21  consideration for -- even if you take the trigger notice and my

22  preliminary interpretation of it out of the equation and -- or

23  even your hypothetical set of circumstances, that even with all

24  that being at play and this being somewhat indefinite in the

25  sense that it's within the buyer's control, you have this kicker

1    clause at the end that if the buyer ultimately walks away two

2    years down, six years down, whatever it is, they have to turn

3    over to you all this documentation that they prepared.

4          Why wouldn't that be consideration for this otherwise

5    seemingly indefinite option?  You got something in exchange for

6    giving them what you gave them.

7          MR. SICKLER:  Your Honor, honestly I read that -- I

8    read that particular provision as applying under a slightly

9    different set of circumstances.  I will in candor to the Court

10   tell you it is one of the less artfully drafted contracts that I

11   have ever read.  I believe my client representative even

12   acknowledged that point.

13         I viewed that more as a termination post closing of

14   the inspection period, that if there was a walkaway, sort of to

15   Mr. Massey's point, as some kind of a workout for the at-risk

16   funding that the work product might be provided; and that was

17   not something that was tied to preinspection period or during

18   inspection period, walkaway termination.  If I've -- if the

19   Court disagrees with that, I will take that on the chin.

20         THE COURT:  Yeah, I'm not sure what I think about that

21   because I haven't focused on that because I've been more focused

22   on the trigger notice being your mechanism to ensure that this

23   isn't an indefinite option.

24         So talk to me -- I mean, you're welcome to talk to me

25   about anything else as to the validity of contract, but what say

1  you to Mr. Massey's argument that that trigger notice was

2  somehow invalid because you didn't meet your initial obligation

3  to give them a title commitment?

4       MR. SICKLER:  We believe that is a red herring, Your

5  Honor.  One, I don't disagree with you.  It's not an argument we

6  made, but I believe that the fact that they didn't assert that,

7  to your point, in the original July 17th response does likely

8  waive that issue.

9       However, at no point in paragraph 4, or Section 4 of

10  Addendum A, does it reference in any way as part of the ability

11  to send the trigger notice that the title commitment actually be

12  provided.  It's a different portion of the contract.  It's in

13  the FAR/BAR portion.  It is not in Addendum A under Section 4

14  and is not a requirement that, you know, assuming that the

15  reasonable discretion is met and all other elements of the

16  contract, including the title commitment, then you're permitted

17  to send the trigger notice.  That's simply not in the contract,

18  Your Honor.

19       Additionally, and to that point that Your Honor also

20  raised, which I think we agree, the buyer was represented by

21  Bruton Campbell-Work.  My client had to waive conflict in order

22  for that to occur.  And Mr. Campbell-Work here at Clark

23  Partington was actually going to be the title agent as well.

24       So at any point, plaintiff, the buyer, had full access

25  to the one individual to whom such a request could and should be

1    made.  I understand my client didn't provide that within the 15

2    days.  The one thing I would clarify from Your Honor's earlier

3    comments is -- and this is just for the record -- is that it was

4    a nearly two-year time frame, roughly two years, little over, by

5    the time that the trigger notice response was sent in even

6    raising that issue for the first time.

7         So to Your Honor's point, if the title commitment was

8    that big of an issue, if anything was actually being done, which

9    obviously we contend it wasn't, somebody could have shot an

10   email.  I mean, I'm not talking about affirmative obligations,

11   contractual issues or whatever.  I'm saying it's two years

12   you've sat on your hands.  You never just said, Hey, can I get

13   my title commitment, and --

14        THE COURT:  Right.  I think I've -- I obviously agree

15   with you on that point.

16        One other issue that I don't -- I didn't discuss with

17   Mr. Massey and I'll certainly give him an opportunity to talk

18   about, but they make an argument that one of the reasons the

19   trigger notice isn't valid was that it wasn't sent to the

20   broker.

21        MR. SICKLER:  Yeah.

22        THE COURT:  I think your argument is who cares,

23   substantial performance, you got it, you responded to it.

24   Anything more about that that you think I need to know?

25        MR. SICKLER:  I think you have encapsulated our

1    argument pretty succinctly, Your Honor.  As the broker has no

2    control over this contract, we view that as really a notice

3    provision for the broker just to understand the state of play,

4    not to enact validity.  It was sent to Mr. Carll both at two

5    email addresses and to his attorney making it a valid trigger

6    notice in that regard.  And attempting to sort of say, well, the

7    broker didn't get it so it doesn't count seems meritless to us.

8         THE COURT:  And, you know, I know we're not in a

9    breach of contract action.  I know the context within which you

10   say I can consider that, but now I'm starting to wonder.  How

11   would your failure to have provided met the obligation to

12   provide the title insurance played in to this hypothetical

13   breach of contract world we're in?  You know, it sounds like

14   you've breached, you're saying they breached.  How would that

15   come out in the wash?

16        MR. SICKLER:  I'm not a hundred percent sure, Your

17   Honor, but we're not the ones here seeking a declaratory

18   judgment in equity from the Court.  We're obviously combating

19   it, which makes their client's activities and actions relevant

20   as opposed to ours in that regard.

21        There is no dispute we didn't provide the title

22   commitment.  Obviously there was factual disputes which I don't

23   think really go to the heart of the case -- I don't know if

24   Mr. Massey disagrees -- about why the title commitment wasn't

25   provided, in terms of whether it was related to trying to get a

1    takedown set up to get particular issues.  I don't know that it

2    is relevant to the issues before the Court.  The fact is no, my

3    client didn't issue any type of title commitment within 15 days,

4    and it was never requested by the buyer.

5         THE COURT:  Okay.  What else do you want --

6         MR. SICKLER:  Ultimately we view it as a non-issue,

7    Your Honor.

8         One of the issues on the estoppel side of things, we

9    would just argue that, you know, one of the -- one of the things

10   that has been said in the briefing and has come up in sort of

11   discussion of counsel is the defendant, the seller, sort of

12   thought it was a contract until they started making this

13   argument in court.

14        The one thing I will say, especially for folks in the

15   Panhandle and sort of water mitigation contracts, which is, I

16   know, an odd read-in, but I don't know a lot of those cases

17   where people didn't think they were contracts until they got to

18   court.  Very frequently people think contracts are contracts.

19   People think the documents they sign are contracts until they

20   take a harder look at it when litigation begins, and they go,

21   wait a minute, this isn't actually a contract.

22        So I don't know --

23        THE COURT:  I guess I --

24        MR. SICKLER:  -- that the subjective belief really

25   matters.

1          THE COURT:  Well, and I guess to me, that -- I guess I

2   have a problem with somebody -- and I think the case law backs

3   this up -- with somebody who takes action under a contract, gets

4   the benefit of the contract, and then later comes in and tries

5   to disclaim there ever was a contract.  I think there's some

6   case law that was cited to me that supports that proposition.

7          And here that seems to be what's happened in two

8   respects.  One, for two years you let Mr. Carll and his team go

9   around the community as if they had the right to do that,

10  discuss everything with everybody about developing your client's

11  property and didn't stop them from doing that, seemed to try to

12  get updates on whether they were doing -- so it's -- I mean, if

13  you put that in the equation, it seems unreasonable for you to

14  come back in and say this -- we really never had a contract.

15  You were just -- in effect what you're saying is you gave us --

16  we had this piece of paper that wasn't legally binding that we

17  were okay with you going out and acting under and now we're not.

18  I have a problem with that.

19          And I also have a problem with the idea that you took

20  an action under the contract by sending the trigger notice.  And

21  by doing that, I don't know how you're not effectively

22  acknowledging that this is a valid contract that gave you the

23  right to do that.  Help me get over that, just, gut reaction

24  that what you're trying to argue now you ought to be estopped

25  from arguing.

1          MR. SICKLER:  To the first point first, and I believe

2     we did include this in our briefing, the issue from our

3     standpoint is that's not really a benefit that inures to my

4     client, and the estoppel standard is that the benefit needs to

5     inure to our client.

6          The due diligence period is solely for the benefit of

7     the buyer.  And if the buyer opts to simply terminate the

8     contract and walk away, I fail to see how any of the two years

9     of going around having strategy conferences, meeting with

10    people, flying to see a crystal lagoon, you know, those types of

11    issues is really for my client's benefit under the contract.

12    Those are strictly -- and are written into the contract as the

13    due diligence that the buyer is doing so that the buyer can

14    determine in its sole discretion if it even wants to move

15    forward with the contract.  And if they terminate --

16          THE COURT:  And I agree with you that that's the

17    weaker of their estoppel arguments, but it seems to me that the

18    benefit you get is the anticipatory benefit of them paying you

19    millions of dollars for this property and knowing that they

20    can't do that until they do this due diligence.  So you, in

21    consideration for allowing them to go around acting like they

22    are going to own this property, you are banking on the money

23    coming in later.  I mean, is that not enough?  I mean,

24    consideration doesn't have to be tangible.  It can be

25    anticipatory, can it not?

1          MR. SICKLER:  I mean, strictly speaking, Your Honor,
2   we just simply disagree that it's enough.  We believe that
3   solely for the buyer's benefit that that is something negotiated
4   in.  If my client had its druthers, the contract would have been
5   signed and closing would have been immediate.  That is a benefit
6   solely for the benefit of the buyer, negotiated by the buyer for
7   the buyer's benefit, not for the seller.
8          THE COURT:  Okay.  All right.  So talk to me then
9   about why acting under the contract doesn't estop you from
10  arguing that it doesn't exist?  Or it --
11         MR. SICKLER:  Again, Your Honor --
12         THE COURT:  -- wasn't invalid from the outset.
13         MR. SICKLER:  My apologies.
14         Again, Your Honor, the issue that we have is that
15  until lawsuit was filed, until things moved forward, I don't
16  think anybody took a strong look at this contract and really
17  said, Hey, is this really a valid contract or not.  I think you
18  had two parties who were operating essentially in good faith
19  until the disagreement arose.  I don't view that in my mind as
20  any different, and I brought it up a moment ago with the water
21  mitigation contracts.  The homeowner signs that thinking it's a
22  contract.  The water mitigation company believes it's a
23  contract.  Once a dispute arises over payment, somebody sues in
24  breach of contract and ultimately a lawyer comes in after the
25  fact and says, Hey, by the way, that's not a contract.  And

1    courts have routinely held that they are not, despite the fact

2    that both parties seem to have been operating under the belief

3    that it was a contract.  Ultimately those --

4         THE COURT:  And did those circumstances involve any

5    affirmative acts taken under the contract?

6         MR. SICKLER:  Under the water mitigation cases, Your

7    Honor, they absolutely do.  The water mitigation company has

8    routinely already finished with the work.  And ultimately what

9    happens in most of those cases is it turns into an unjust

10   enrichment claim because there is no contract, and then, you

11   know, there are legal ramifications there where property is not

12   lienable and all those things that really have no bearing or

13   relevance here.

14        I only bring up those types of cases as just an

15   illustrative point that frequently two parties believe something

16   is a contract and operate as though it's a contract until

17   there's a dispute that arises and lawyers look at it and go,

18   that -- wait a minute, guys, that's not really a contract.

19        And I believe that's what's happened here.  The

20   trigger notice was utilized because that was what was in the

21   document.  Once the suit was filed, we got involved.  And

22   frankly, without delving too deeply into anything that might

23   violate privilege, the issue of whether or not this was a

24   contract is our argument.

25        THE COURT:  Nothing, though, would have precluded your

1    client from coming to you saying they've been tying up our

2    property for two years, can we terminate it for that reason.

3    This argument could have come up, and it could have been the

4    first letter rather than the trigger notice, right?  Could have

5    been.

6              MR. SICKLER:  Ostensibly, I suppose there are

7    interactions with Mr. Matthews that could have been the case,

8    yes.

9              THE COURT:  Okay.  I don't know -- I'm not sure what

10   the significance of the fact that it wasn't is, although it

11   just -- to me, when we're in equity, it just smacks me as

12   improper, inequitable, inappropriate to say, I'm using it on

13   this hand, but I'm -- you know, got the knife behind me on the

14   other hand to stab you in the back with.  Something about that

15   just doesn't sit well with me.

16             MR. SICKLER:  Understood.  I would just -- you know,

17   in furtherance of that, Your Honor, I would just -- I think the

18   plaintiff spent a lot of time on the *Gleason* case, and I would

19   just point out this is very factually distinct.  And I think

20   that in a case like the *Gleason* matter wherein they actually

21   contracted -- the developer in that particular case contracted

22   with someone to use their likeness and to utilize their golf

23   course design in order to profit and then did profit and

24   actually received funding in the form of increased revenue and

25   increased properties before then trying to disclaim the contract

1    after having reaped those benefits, I think if something like

2    that were to have happened here, I think the argument from the

3    buyer side of the case would be more stronger.  They're just

4    simply isn't anything of that effect here.  My client has been

5    provided nothing.  My client has not retained any money.  The

6    escrow has been released.

7            THE COURT:  And I guess that brings me to a question.

8    Why didn't they retrain the $50,000, the contract, the FAR/BAR

9    portion of it, gave them the authority in the event of a buyer

10   breach to retain the deposit.  That's what you're now saying

11   happened:  the buyer breached.  Why didn't they keep the

12   50,000?

13           MR. SICKLER:  I believe, Your Honor, again without

14   delving too far into other matters, is my clients were hoping

15   that the good faith of letting that go would allow this to be

16   put behind everybody and everybody could go their separate ways.

17   Nobody wanted to have this kind of a fight over 50 grand.

18           THE COURT:  Right.  But I certainly didn't see any --

19   I don't think I saw, maybe you can correct me, in any of the

20   letters that were going back and forth saying, We consider you

21   to be in breach; therefore, pursuant to the contract, we're

22   keeping your 50,000.  But as an amicable way to resolve this

23   case, we'll give you the 50,000, we'll go our separate ways.

24   That wasn't in any of the record I have, right?

25           MR. SICKLER:  Correct, Your Honor, hence my hedge on

1    attorney-client privilege discussions.

2              THE COURT:  Understood, understood.

3              All right.  What else do you want me to know?

4              MR. SICKLER:  I think I've addressed most of the

5    questions I hope admirably.  I would stand on the rest of the

6    briefing.  I don't know that there's anything else that I wanted

7    to draw to Your Honor's attention, unless you have more

8    questions for me.

9              THE COURT:  I don't think so at this point, but let me

10   hear from Mr. Massey, and then if that triggers anything, like I

11   said, we'll all talk until we're done talking.

12             MR. MASSEY:  Your Honor, just a couple just quick

13   things to mention.

14             Your Honor's questions about the title examination in

15   conjunction with the trigger notice, and essentially what I

16   understand defendant to be saying, is, well, that's just a

17   different provision of the contract entirely.  That's what the

18   defendant is asking you or that stands in apposite to what the

19   defendant is asking you to do with taking the

20   time-is-of-the-essence clause and applying it to everything

21   else.  And so I think there's a distinction within --

22             THE COURT:  I guess to me the time is of the essence

23   is not the real significant portion of the FAR/BAR contract.

24   That's just standard language, and that means if we say we want

25   it done on Thursday, that means we want it done on Thursday.

1    Friday maybe, but not two weeks from Saturday.

2         The important part of the FAR/BAR is the provision

3    that talks about due diligence, paragraph 15:  "Seller and buyer

4    will use due diligence and good faith in performing their

5    obligations under the contract."

6         And so it seems to me their argument is that that's

7    the provision that you breached, not this -- again, I don't

8    understand what time of the essence.  Maybe Mr. Sickler in his

9    response or rebuttal can explain that to me, but I don't see how

10   that has any bearing on any of the determinations I'm going to

11   be making.  Because when you have a period that is, by

12   definition, open ended, tied to getting approvals, there's no --

13   I don't see how we say time is of the essence with that or how

14   that comes into it.  But it does obligate you to exercise due

15   diligence in trying to get to those approvals, and that's what

16   they're saying you didn't do.

17        MR. MASSEY:  Understood, Your Honor.  And just again

18   to counter that, the -- there is no dispute about what the facts

19   are for what buyer was doing pursuant to the due diligence

20   phase.  The trigger notice is exactly the remedy that the

21   parties contracted for if the defendant said no, that's not

22   enough.

23        To clarify one thing that we discussed earlier, Your

24   Honor, you were talking about the earnest money deposit, about

25   whether it's at risk.  Let me be perfectly clear.  The contract

1    says it's at risk.  The exact fact pattern of how that would

2    apply, candidly I have not analyzed that because that's not the

3    issue before the Court.

4         THE COURT:  But the answer can't be that you don't

5    close and you get your money back at this point.  I mean, that

6    can't be the answer.  If it is, what does "at risk" mean?

7         MR. MASSEY:  Sure.  And I'm not arguing that point,

8    Your Honor.  And so I take that --

9         THE COURT:  Okay.

10        MR. MASSEY:  I stand back on that point.  I'm not at

11   all contesting one way or another.  It says at risk.

12        I want to address the water mitigation cases, Your

13   Honor.  Candidly, those aren't -- I don't see the relevance of

14   the water mitigation cases here.

15        I'm sorry.  I'm just trying to look through my notes

16   to see if there's something I missed.  I don't want to rehash or

17   regurgitate the arguments I've already made, Your Honor.

18        We staunchly disagree with there's any idea that this

19   thing could be tied up for six, eight years, something like

20   that.  That's not the fact pattern, and there's the trigger

21   notice.

22        THE COURT:  I think what the seller is asking me to do

23   is say you don't get a declaratory judgment one way or the other

24   because you've come to court with unclean hands by breaching

25   this contract.  So how can I say that -- maybe it's a better

1  question for Mr. Sickler.  How can I say that without, in

2  effect, adjudicating a breach of contract claim?

3          MR. MASSEY:  Because candidly, Your Honor, I just

4  don't think that there are any facts to support an unclean hands

5  argument here.

6          THE COURT:  Well, let me maybe phrase it this way.  Do

7  you agree with him that if you breached the contract, you will

8  be coming to court with unclean hands, or do you think unclean

9  hands requires something more than that?

10          MR. MASSEY:  Oh, I think it absolutely does.  I think

11  the case laws bears it out in the sense of it talks about, you

12  know, unconscientious or unscrupulous behavior, things of that

13  nature.  An unclean hands argument in my mind, and I think it's

14  supported by the case law, is something different than just

15  breach of contract.  But again, it's hard for me to argue that

16  point because there's nothing in this fact pattern that supports

17  breach of contract or unclean hands on behalf of the buyer.

18          THE COURT:  All right.  Then help me on the due

19  diligence -- again their argument, as I understand it, is you

20  breached the contract by failing to exercise -- failing to use

21  diligence in performing your obligations during the inspection

22  period.

23          MR. MASSEY:  Absolutely, Your Honor.  The remedy if

24  they believe that we breached --

25          THE COURT:  Well, I guess the question is, if that's

```
 1    the allegation that you've done, is there not evidence? is there

 2    conflicting evidence?  What is the resolution of that?  I mean,

 3    that's their argument.  That's the breach of contract argument,

 4    as I understand it.

 5              MR. MASSEY:  Sure.  The resolution is the trigger

 6    notice.  I mean, that's what the parties contracted for.  If

 7    they believed that there's not enough due diligence, using air

 8    quotes, then they send the trigger notice.

 9              This -- that sort of nebulous idea of what is good

10    enough or not good enough in plaintiff's sole discretion to

11    inspect the property, that's -- that's just -- that's part of

12    the contract.  That's not an unclean hands.  That's not breach

13    of contract.  There is a trigger notice, and the trigger notice

14    controls the remedy under that hypothetical fact pattern.

15              THE COURT:  All right.  I'll give you another

16    hypothetical.  So we're in a world where the trigger notice

17    wasn't sent.  Instead, what was sent was a variation of the

18    letter that once the attorneys got involved -- which was you've

19    tied our property up for two years, we consider you to have

20    breached your obligation to use due diligence in performing your

21    obligations, and, thus, as a result of that breach, we don't

22    intend to perform under the contract.

23              You then -- somebody then files suit, declaratory

24    action, breach of contract action.  We're in court over a breach

25    of contract action on that basis.  They're saying you didn't do
```

1   what you're supposed to do under the contract.  How are you

2   defending that?

3         MR. MASSEY:  And the hypothetical would be if the

4   trigger notice never --

5         THE COURT:  Never sent.  Never sent.  They just --

6   they just said we're tired of waiting.  We're not going -- you

7   breached it already.  That's their argument.  It's been two

8   years, you breached it, we're not performing any further.

9         I mean, do you -- what evidence would I look to to

10  determine whether you have or haven't breached?

11        MR. MASSEY:  Sure.  Mr. Carll's testimony in the

12  transcript.  I mean, he's -- there's absolutely no question

13  about the facts of everything that he did for his -- for buyer's

14  due diligence.  So from a factual determination, that's there.

15        THE COURT:  So you would say based on those facts, I

16  would -- if we were in this hypothetical breach of contract

17  action, I would be able to find as a matter of law that the

18  contract was not breached?

19        MR. MASSEY:  Absolutely, Your Honor.  And that's all

20  against the context of buyer has the right in his sole

21  discretion to do the due diligence.  And that's -- again, that's

22  taken directly out of the contract.

23        I understand Your Honor's hypothetical.  In my mind

24  it's a little bit difficult to answer because the contract would

25  have to be rewritten to such a drastic degree to get that, to

1    that position.

2          If you sense me struggling to articulate it, it's

3    because of that, because I'm trying to figure out -- setting

4    aside what the parties agreed to and contracted to under freedom

5    of contract, we would have to write it and rewrite the contract

6    in such a drastic way to get to that hypothetical that that's

7    the reason why -- if it seems like I'm struggling to answer,

8    it's not because I'm not confident in it, it's just I'm trying

9    to rewrite the contract on the one hand.

10          THE COURT:  I don't know if it's necessarily rewriting

11    the contract.  I mean, the only thing that's kind of taken out

12    is the trigger notice.  I mean, everything else is the same.

13    You have an inspection period to determine at your discretion

14    whether you can do with what you want with the property.  The

15    inspection period closes on approvals.  I think it's reasonable

16    to infer from that that the due diligence that was contemplated

17    would at least include in some way, shape, or form due diligence

18    in getting those approvals.

19          And so I've got undisputed facts that you did a lot of

20    other stuff that probably would qualify as due diligence, but

21    you didn't do anything towards getting the actual approvals by

22    submitting an application.  And that's where I'm going with

23    the -- can I determine that as a matter of law?  Is that a

24    factual dispute?  If we were in this breach of contract action,

25    would I have to look at what you did and what you didn't do and

```
1    make a factual determination as to whether that was due

2    diligence or not?

3              MR. MASSEY:  No, I don't think you would, Your Honor,

4    because there's also the provision that we can still close even

5    without the water and sewer.  So that's also built into the

6    contract.

7              THE COURT:  Gotcha.  Okay.  What else do you want me

8    to know?

9              MR. MASSEY:  I'm happy to answer any questions that

10   Your Honor might have.  I think we've covered what's in the

11   brief.  I rest with the positions that we put forth in the

12   brief.

13             THE COURT:  All right.  I think I've exhausted the

14   questions I have at this point.

15             Mr. Sickling -- Sickler, I'm sorry.  Do you want to

16   weigh in to that discussion?

17             MR. SICKLER:  That's one of the nicer versions of my

18   name I've gotten wrong.  No harm no fowl, Your Honor.

19             A couple of quick points on the hypothetical you just

20   gave to Mr. Massey.  What I did want to note and sort of to Your

21   Honor's point, the trigger notice does, in fact, only apply to

22   approvals.  It doesn't apply to anything else.  There isn't

23   anything in the trigger notice provision that says if you don't

24   think that the buyer has, for instance, failed to start

25   obtaining engineering cite drawings, lot-specific drawings, an
```

1  ALTA survey, a topographic survey, an environmental survey, a

2  tree survey, a completed utility plan, fire department plan,

3  direct bore plan for forced main line, a sewer lift station

4  design, a DEP wetland crossing plan, or a Florida DOT approved

5  plan for ingress and egress --

6          THE COURT:  Where are you reading all that from?

7          MR. SICKLER:  The November 16th letter wherein the

8  buyer admitted he hadn't begun to do any of those things.  Those

9  things are not covered as bases for the trigger notice.  Those

10  would have been covered under the due diligence paragraph to

11  actually begin to perform those things.

12          So I think as a factual matter, you don't have to make

13  any factual determination.  It's an admission in a letter that

14  none of those things were actually begun.

15          THE COURT:  But I guess the -- I guess what I'm

16  struggling with, though, in trying to avoid is having to have

17  some sort of factual evidentiary hearing, is that it seems to be

18  undisputed by both Mr. Hayes, Mr. Dantin, Mr. Carll that there

19  are a lot of things that have to be done before you even get to

20  that process to begin in earnest seeking applications.  And it

21  almost seems like a timing question.

22          Do you do all of those things first with all the money

23  associated with it and then do the glad-handing afterwards, or

24  do you do the glad-handing first and then hope that all those

25  things you need to do will be more effective and efficient on

1    the back end?

2         And that's why I'm struggling to understand if we were

3    in this hypothetical breach of contract action, I would

4    ultimately have to determine that they failed to exercise due

5    diligence, which is really the contract provision, in obtaining

6    these approvals.  And with the evidence I have, yes, it's

7    undisputed they didn't make these applications, but it seems to

8    be also undisputed that everything they did was moving that --

9    related to that, setting the groundwork for that.  And so how

10   would I -- how could I determine as a matter of law that the

11   things they didn't do were not outweighed by the things they did

12   do, or vice versa?

13         MR. SICKLER:  I think that that's a determination Your

14   Honor can make here.  I don't know if Mr. Massey disagrees.

15   With the record that we have before us, I think both sides would

16   likely be fine, Your Honor, with making that determination based

17   on the testimony of both Mr. Hayes and Mr. Carll in terms of

18   what would be required for these types of contracts and the

19   record of what had and hadn't been done in terms of sort of

20   strategy sessions versus actual deliverables that would be

21   necessary in order to even begin to submit a development order.

22         Because keep in mind that to submit the development

23   order and have it considered -- I mean, obviously you can sign a

24   development order and submit it improperly, but if you actually

25   want to have it considered, you have to have all those documents

1   that are actually contained in that November 16th letter that

2   had not even been begun to be obtained, which was my client's

3   position for why there was no diligence because having meetings,

4   having phone calls, not really advancing the ball to actually

5   obtain any of these documents, given the fact that none of them

6   had even been started to be obtained, according to the letter.

7         THE COURT:  And on that point was -- I don't think

8   there was any evidence to dispute the explanation that Mr. Carll

9   provided, which was -- again to simplify it -- until I had some

10  more firm assurance that sewer -- water and sewer were going to

11  be available, I didn't want to spend the 3 to $5 million

12  necessary to put together all those things that you just

13  described there.  Was there any evidence to say that that was

14  not a reasonable approach?

15        MR. SICKLER:  Your Honor, I'll defer to you on that.

16  I believe my client testified to the opposite, but that would be

17  something I would have to go back and check.  I don't have

18  Mr. Hayes' entire transcript before me or even on recall.  But I

19  believe he testified that the amount of time being taken for

20  these particular issues was unreasonable.

21        THE COURT:  And if that's the case, I guess that kind

22  of begs the question as to whether -- because it seems to be

23  that's the 64 million --

24        MR. SICKLER:  23.5-ish.

25        THE COURT:  -- $23.5 million question in this case is

```
 1    if -- if -- we know what he did, we know what he didn't do, and
 2    we know why he didn't do what -- why he didn't do what he didn't
 3    do.  And so the question is if there's somebody saying that the
 4    reason he didn't do what he didn't do was improper,
 5    unreasonable, then I've got a factual dispute that I would --
 6    again, I don't know if I resolve it in this case or a
 7    hypothetical case of breach of contract, but, you know, there's
 8    some issue there perhaps.  Unless the parties agree that I can
 9    kind of make that assessment and make a global assessment that,
10    okay, I've taken into consideration what he did, I've taken into
11    consideration what he didn't do, I've taken into consideration
12    the reason he said he didn't do it, and I've taken into
13    consideration the conflicting view as to he should have done it,
14    and on balance I find X. -- seems to me where we would need to
15    be.  And from your perspective, you're okay with me making that
16    determination?
17              MR. SICKLER:  I believe we are, sir.
18              THE COURT:  And Mr. Massey, what about you?
19              MR. MASSEY:  Your Honor, in my mind, I view this as
20    just an application of the existing facts to the law.  So I
21    think to that degree, then -- I think that answers your
22    question.  In other words, if there's not -- I can't think of --
23    you know, an additional expert or anyone that the parties would
24    call to help with that aspect.
25              THE COURT:  All right.  I mean, we have three
```

```
 1   people -- Mr. Carll, Mr. Hayes, and Mr. Dantin -- at least, all
 2   of whom are developer-type folks, and they told me what they're
 3   going to tell me.  I worked with Mr. Dantin indirectly back in
 4   probably the '90s when he was working for St. Joe and we were
 5   doing the SouthWood project or the WaterColor project.  And we
 6   had no relationship beyond that, but I know he's been in the
 7   industry for a long time.
 8           All right.  Mr. Sickler, anything else you want to
 9   tell me?
10           MR. SICKLER:  No, Your Honor.
11           THE COURT:  All right.  Let's do this.  We've been
12   going for about an hour and a half.  Let's take a short break.
13   And I anticipate being able to come back and give you what I
14   think the answer is, and we'll see how to proceed from there.
15           All right.  We're in recess, maybe 15 minutes.
16       (Recess taken from 10:30 a.m. to 10:46 a.m.)
17           THE COURT:  All right.  You can have a seat.
18           All right.  One question I didn't ask, and then we'll
19   wrap this up.  I guess I'll start with Mr. Massey.
20           If you look at paragraph 5 of the addendum which talks
21   about the closing, and there's another bit of language in there
22   about if the parties do not -- and city do not mutually agree
23   that water and sewer can be provided to the first takedown area,
24   then either party may terminate the agreement, and upon
25   termination, earnest money will be returned.
```

1          How do you read that in relation to the at-risk

2    provision?

3          MR. MASSEY:  I will admit I think that there's a

4    conflict between those two different portions.  I understand

5    what Your Honor's picking up on.  That's one of the things that

6    I picked up on as well.  It goes back to just how this contract

7    was drafted.

8          I think there's an argument to make that the at-risk

9    language could potentially trump that language, especially when

10   you take the context of how earnest money deposits in these

11   situations are treated.

12         THE COURT:  Okay.  And -- all right.  Well, let's see

13   what Mr. Sickler has to say, and I'll tell you what I think.

14         MR. SICKLER:  Your Honor, I don't necessarily disagree

15   with Mr. Massey.  I believe that because the inspection period

16   issue and the close of the inspection period, the payment of the

17   additional earnest money stating that it's at risk, given the

18   fact that that language specifically contemplates the fact that

19   approvals are not in place at that time may well trump.

20         Again, I will admit I have not spent a ton of time

21   analyzing those two things in concert, but I think it would be

22   potentially reasonable for Section 4 and the language there to

23   trump Section 5.

24         You could read it another way; that is, if the buyer

25   were to start the scheduled closings without having to go

1    through and actually obtain those approvals to move forward in

2    that regard and that it was ultimately determined that perhaps

3    paragraph 5 would control as opposed to paragraph 4 at that

4    rate.

5             THE COURT:  It seems like to me the -- that

6    paragraph 5, if it was read in a way that made the earnest money

7    no longer at risk, it seems to defeat the whole idea of the --

8    the trigger defeats the whole idea of this not being potentially

9    an open-ended contract.

10            And so I think maybe the most logical reading of it

11   might be that that language contemplates a world where the

12   trigger notice wasn't sent.  Because the trigger notice being

13   sent is the only thing that puts the money at risk, as far as I

14   can tell, under this contract.  So I think I'm reading it the

15   way you'd want me to read it.

16            Is there --

17            MR. SICKLER:  I would love you to read it, Your Honor,

18   whatever way gets my client out of this contract.

19            THE COURT:  That's not going to happen.

20            MR. SICKLER:  Understood, Your Honor.  I jest.

21            I don't necessarily disagree.  Again, candidly, I

22   haven't sat and looked at those machinations, but it certainly

23   makes sense from a logic standpoint that paragraph 4 is intended

24   to apply in circumstances where a trigger notice is, in fact,

25   sent.  And paragraph 5 may apply to a world in which no trigger

1    notice was sent and the parties were just moving towards a

2    closing and ultimately water and sewer was never obtained -- or

3    was never provided by the city.  I don't want to say obtained.

4         THE COURT:  And I think, Mr. Massey, it's fair to say

5    you haven't necessarily conceded the point, but you acknowledge

6    that that is -- interpretation is a potential reasonable

7    interpretation of the contract?

8         MR. MASSEY:  Agreed, Your Honor.

9         THE COURT:  All right.  And I guess -- well, all

10   right.  Let's do this.  Okay.  Thank you.

11        And the reason I wanted to have this argument was

12   twofold.  One, because as you can see, there were a number of

13   questions I had.  And the parties did a very good job in

14   briefing the case, but there are just a few things about what I

15   think is a relatively poorly written contract that warranted us

16   having a discussion and seeing if we can crystallize at least my

17   thinking on it.

18        And the other reason I wanted to do it -- and I'm

19   sorry it took this long to get on the calendar.  I don't know if

20   that was my calendar or your calendars, but I was hoping to have

21   done this a little bit in advance to get an answer to the

22   parties because what the parties need in this case more than

23   anything is an answer.  Are you married?  Are you not married?

24   And I was hoping we could have done that a little bit sooner

25   than now.  And the trade-off was going to be expediency versus a

1    long written flowing order.

2              And so even though we didn't get the expediency I was

3    hoping for, I do still want to try to get out of a long flowing

4    order.  And so my intent here is to articulate what my findings

5    are, what my interpretations are, and ultimately incorporate it

6    into a -- kind of a "for the reasons stated on the record,

7    here's what the answer is" order.  And so that's why I'm going

8    to kind of walk through more detail what I think and what I view

9    the record as and what I find.  And then at the end of that, if

10   there's clarification that's needed, we can talk about that and

11   where we go from here.

12             So what I understand this case is about, the buyer is

13   seeking a declaration that the contract is valid and still in

14   effect.  The seller contends that the contract was never valid

15   and that it's no longer in effect because it terminated the

16   contract.

17             The July 2023 termination notice was based solely on

18   the buyer's failure to timely respond to the trigger notice.  A

19   reaffirm, both in August and December of 2023, that the contract

20   was terminated.  The rationale shifted a bit that in August '23

21   they asserted, I think, seems like for the first time, that the

22   ground for termination was that the buyer effectively breached

23   the contract by tying up the property for two years without

24   doing anything to get the approvals.  December 2023 letter

25   essentially said nothing new.  So that kind of set the stage for

1    where we get to.

2         And as I see it, the basic facts are undisputed.  The

3    parties entered into a contract in July of '21.  A $50,000

4    deposit was paid.  There's a contractual provision that says

5    time is of the essence.  There's also a provision stating that

6    the parties are to use their due diligence in complying with

7    their obligations under the contract.  The contract included an

8    inspection period that ran either 120 days after the contract or

9    when approvals were obtained, whichever is later.  The contract

10   defined approvals to mean all the things you would need to

11   actually start turning dirt.

12        Importantly, the contract allowed the seller to send a

13   trigger notice at any point 150 days after the contract

14   essentially forcing the buyer to make a decision on whether they

15   were going to proceed.  The closing is ultimately conditioned on

16   water and sewer availability.  Water and sewer availability was

17   the thing that led to the trigger notice.

18        The evidence, as I read it, says that water and sewer

19   availability can't be definitively confirmed until a development

20   application is filed and you get in line.  The buyer finally got

21   confirmation to its satisfaction that water and sewer would be

22   available in June of '24, got that confirmation in the May '23

23   time frame.  How they got that, whether they got it on their

24   own, whether the seller got it to them really is immaterial for

25   my purposes.  But before getting the confirmation, the buyer

1  didn't want to spend the millions of dollars necessary to do the

2  studies and all the things necessary to prepare the

3  applications.  And I'll talk about that in a minute based on

4  what we talked about just a minute ago.

5          It's undisputed the buyer didn't submit any

6  applications between July of '21 and getting that notification

7  in May of '23.  It did later on, but we'll talk about that in a

8  minute.  The buyer -- during that period, though, the buyer was

9  meeting with numerous agencies working out plans during that

10 period and setting the groundwork for the applications and the

11 approvals that it was hoping to get.

12         So that brings us to June of '23 when the trigger

13 notice was sent.  It wasn't sent to the broker.  My view:

14 That's immaterial because the buyer admittedly received it.  The

15 whole purpose of the broker notice was to make sure that

16 somebody got it.  Here, the buyer admittedly got it.

17         The seller hadn't provided title insurance by then,

18 but to my view, that was unrelated to the trigger.  The buyer

19 didn't ask for it in any of the two years prior to that.  And

20 more importantly, as I'll talk about later, the buyer

21 effectively waived that as a condition of exercising its

22 decision on the trigger notice by exercising its decision

23 without having it.

24         So the buyer then timely notified the seller that it

25 intended to proceed in response to the trigger notice.  It was

1    initially a dispute as to whether the July 17th email was timely

2    because the 30th day was the 15th.  And ultimately I think

3    that's been conceded, and the contract supports it, that the

4    time moved over to that next Monday, and so the response was

5    timely.

6            The buyer paid the additional $200,000 required when

7    they exercised the trigger notice.  Record doesn't tell me when

8    that happened, but that doesn't appear to be in dispute that the

9    timing of that makes any difference here.

10           So at this point, there's $250,000 in escrow.  My view

11   of that is under the contract that money is now at risk.  If

12   this project doesn't close, the seller gets the $250,000.  And

13   I'll talk about in a little bit that interpretation of that

14   provision that we just spoke of.

15           So now we're in July of 2023, parties are -- lawyers

16   are sending letters back and forth to each other.  Buyer has his

17   preapplication conference in October '23, asks the seller to

18   cooperate by signing applications of things.  The seller refuses

19   to do that, reiterates his position that the contract is

20   terminated, and here we are.

21           It also appears to be undisputed that a project like

22   this has a lengthy due diligence period.  Mr. Dantin, Mr. Carll,

23   and Mr. Hayes all seemed, my view, consistently to recognize

24   that it could be two to three years from contract to getting the

25   water and sewer.  There was a slight dispute, I thought, as to

1    whether that period from Mr. Hayes' perspective was contract to

2    build or contract to approvals.  But going back and skimming his

3    deposition, it looks like on pages 34 and 35 of his deposition,

4    he was talking about another D.R. Horton project that took two

5    to three years between execution and when water and sewer became

6    available and then was asked is that time period fairly typical,

7    and he says it is.  And so I don't see a real material conflict

8    between the parties about how long this due diligence period was

9    going to take.

10         The other thing -- and I'll go ahead and talk about it

11    here.  Factually, we know what the buyer was doing:  meeting

12    with people, setting groundwork.  We know what it wasn't doing:

13    preparing applications, doing studies, and all the things

14    necessary to prepare the applications.  We know why they weren't

15    doing that because it was going to cost -- I wrote down 3 to

16    $5 million, and they didn't want to spend that money until they

17    find out whether they're going to actually have the water and

18    sewer when they need it.

19         And there was some testimony, I can't remember if it

20    was from just one side or both sides, that recognized the City

21    of Freeport maybe has not been as reliable as it could be in

22    getting water and sewer places where it needs to get it.

23         And so I find, to the extent that there is a conflict

24    that the parties seem to be okay with me resolving, I find that

25    it's reasonable for Mr. Carll and the buyer to have done what

1    they did and the way they did it and to have not done what they

2    didn't do before getting that assurance.

3         I read back through Mr. Hayes' deposition.  As I read

4    it, at most he was saying that what could have been -- what the

5    buyer -- the buyer could have done what they did and done what

6    they didn't do quicker, but I didn't see him taking issue with

7    the basic reasonableness of the phasing of what Mr. Carll was

8    doing.  And so I think that plays into the question of due

9    diligence, which I'll talk about here in a minute.

10        So that brings us down to the legal issues that I need

11   to decide.

12        First one is was this even an enforceable contract

13   from the outset.  The buyer says it was because it has all the

14   material terms that it needed.  Seller says it wasn't because it

15   was effectively an indefinite option that didn't include a time

16   frame for ever completing the inspection period.

17        And I think in the absence of the trigger notice,

18   there might be some merit to that, to the seller's position.

19   But the fact that there wasn't a definitive time period for

20   completing the inspection period, I don't think, in and of

21   itself, is something that would make the contract unenforceable,

22   because the law would require me to interpret a reasonable

23   period of time for that inspection period to close.  And under

24   the evidence that I saw in this case, a two- to three-year

25   period would be what I would be looking at.

1        And more importantly, the trigger notice was in place

2    for this exact purpose, which was if the inspection period

3    wasn't running as quickly as the seller hoped it would, they had

4    a mechanism in place to force the buyer to make a decision as to

5    whether they're going to proceed.  And so in my view, that takes

6    us out of the indefinite option situation, and so we have a

7    contract which has an offer, has acceptance, it has mutual

8    consideration, and all the terms necessary to be valid.  And so

9    in my view, this was a valid contract from the outset.

10        And I'm not -- it's not necessary for me to rely upon,

11    and so I don't, this idea that at the end of the contract if

12    things fell apart, the consideration would be you get all of our

13    studies.  I'm not sure that I buy that, and particularly in this

14    case where none of that was done.  They would essentially get

15    nothing for that.

16        But at the end of day I don't need to get to that

17    because I think the contract with the trigger notice was

18    sufficient because -- and most importantly, because it required

19    the seller -- excuse me, the buyer -- to put up an additional

20    $200,000 which was then at risk.  So at that point, the seller

21    had a way of ensuring that worst it's going to do for its

22    property being tied up was get $250,000.  I think that's more

23    than ample consideration.

24        So that then brings the second question.  Was the

25    trigger notice effective.  The buyer says no because it wasn't

1    sent to the broker and because the seller hadn't delivered the
2    title commitment.  As I mentioned before, the purpose of the
3    broker notice is to be sure the buyer gets it.  But it's
4    undisputed here the buyer got the trigger notice and responded
5    to it.  So my view the non-compliance with the broker provision
6    is immaterial to the validity of the trigger notice.

7           As to the title commitment, I certainly understand the
8    argument that how can you expect us to make the decision on
9    whether we're going to move forward if we don't have the title
10   commitment.  And I think that would be a good argument to have
11   made before responding to the trigger notice.  But by responding
12   to the trigger notice saying we are moving forward, by saying --
13   putting the additional money up, I think as to -- for that
14   purpose, any non-compliance with the title commitment was
15   waived.  And certainly there's nothing in the contract saying a
16   precondition of sending the trigger notice is getting the title
17   commitment.

18          I think you could have had a decent argument that
19   we're not going to respond to your trigger notice because how
20   can we possibly know whether we're going to close on this
21   contract until we get your title commitment.  But by not raising
22   that issue at that point and proceeding in response to the
23   trigger notice, I think you waived that.  So I think the trigger
24   notice was effective, trigger notice timely responded to.  It's
25   undisputed at this point it was.

1          And so that, I guess, brings us to, you know, kind of

2     the latter question.  So where we are right now, I think the

3     buyer's entitled to a declaration that there's a contract in

4     place, that -- it may be a declaration they don't want, but

5     they've got $250,000 at risk at this point and now we're moving

6     towards closing.

7          And I think the only thing that would change that is

8     if I somehow determined that the buyers would not be -- buyer

9     would not be eligible for a declaratory judgment because they

10    have come to court with unclean hands.  And the argument I've

11    gotten on that is they did because they breached this contract

12    by not exercising due diligence in the inspection period.

13         I'm not sure that that is the kind of unclean hands

14    that the law is talking about.  I tend to agree with

15    Mr. Massey's assessment.  The cases I read, to have unclean

16    hands you've got to have engaged in more unscrupulous,

17    condemnable trickery, that type of conduct rather than simply

18    not performing obligations under a contract.

19         Certainly, I didn't see any evidence in the record,

20    nor did I even see an accusation from Mr. Hayes, that the buyer

21    was acting in bad faith or duping it into one thing or another.

22    Maybe they weren't happy with the information they were getting.

23    I think Mr. Sickler even used that argument -- made that

24    argument, but cabin that by saying we're not actually accusing

25    him of that.

1          So anyway, the bottom line is I don't think there's

2     the type of unclean hands necessary to say you're not entitled

3     to a declaration.  Even if I was persuaded that simply breaching

4     the contract was enough to disentitle you to a declaratory

5     judgment, I don't think I could find -- or I would not find,

6     based on the facts that I've seen, that you breached the

7     contract.

8          And again, I think it goes back to the due diligence

9     provision.  To me, the time-of-the-essence provision is not

10    really the controlling one here.  It's the due diligence period.

11    You had to use due diligence in trying to do everything you were

12    obligated to do under the contract.  One of those things is to

13    make a determination as to whether this property was suitable

14    for you and could get the approvals that you needed.  And so the

15    question I would determine in saying did you breach this

16    contract was did you use due diligence in trying to make that

17    determination.

18          And here, we know what Mr. Carll did, we know what he

19    didn't do, and we know why he didn't do what he didn't do.  And

20    as I said before, I don't think that was unreasonable.  Could it

21    have been more, quicker, sooner, faster, better?  Probably.  But

22    does that qualify as a lack of due diligence?  I think not.

23          And so I wouldn't find that there has been a breach of

24    the contract that would entitle -- that would disentitle the

25    plaintiff to a declaratory judgment for coming to court with

1    unclean hands.

2         So the bottom line from my perspective, and I think

3    the declaration that you'd be entitled to here, is that the

4    contract is valid, is still in effect.  Your $250,000 earnest

5    money is at risk.  You don't close on the contract, you lose

6    $250,000.  And at this point, because the contract is still in

7    effect, the seller has an obligation to cooperate with the

8    applications and anything necessary to get the approvals so

9    somebody can develop this property at some point.

10        So that's how I see the case and how I would resolve

11   the case.  I would like to do that in just a one-page order for

12   the reasons stated on the record.  This is what you get.

13        But before I do that, I want to get, Mr. Sickler,

14   since I think that mostly is against you, do you have any

15   additional findings you think I need to make or any

16   clarification to the ruling that you need?

17        MR. SICKLER:  I don't know that I do, Your Honor.

18   Candidly, I think the only sort of outstanding issue -- and I

19   don't know that it's been briefed or before the Court, so I

20   don't know that it would be wholly appropriate as we sit here

21   today for a ruling -- is sort of where are the parties in the

22   postinspection period?  But again, that's not something that's

23   been briefed, it's not something that's been argued, so I don't

24   know that it would be appropriate to be on the record for

25   purposes of this ruling.

1          THE COURT:  Yeah, and I don't know if I could -- I

2    don't know what would guide me in making that determination --

3          MR. SICKLER:  Correct, Your Honor.

4          THE COURT:  -- because there's no -- contract didn't

5    contemplate that you'd be in litigation for a year and a half.

6          And I guess that would be -- and before I get to

7    Mr. Massey, see if he needs any clarification or additional

8    findings, I mean, what I anticipated -- and it's unfortunate

9    that Mr. Hayes isn't here, because what I was hoping was both

10   the principals would be here to hear that.  And I'm sure counsel

11   can dutifully convey that, but it seems to me that there's some

12   additional negotiations that need to be had between the parties

13   on the point that you just raised and on, you know, probably the

14   reality on the ground that, you know, two years -- even if we

15   start the clock two years from today, I'm not sure the buyer's

16   really going to want to -- or be able to get everything done

17   within two years to know they can do what they want to do.

18         But now that they know their $250,000 is at risk, they

19   may have a different view of where things are and may want to go

20   back to the negotiating table.  And prices may have changed.  I

21   don't know what the parties want to do, but it seems to me that

22   the parties are going to need to negotiate that point and where

23   we are and where we're going points in light of a ruling maybe

24   they didn't anticipate or didn't hope for.  But I can't control

25   any of that.

1              So with that, Mr. Massey, any additional findings or

2      clarifications you think are necessary at this point?

3              MR. MASSEY:  No.  I agree, Your Honor.  The only point

4      was just going to be what Mr. Sickler raised, which is

5      essentially where we are.  I think our view would be that the

6      date of Your Honor's ruling is day one of postinspection period.

7      There's other day-for-day types of provisions that apply in the

8      contract as well.  I think that starts to get into some calendar

9      calculations that candidly I'm not prepared to argue today.  But

10     since it has been in limbo due to seller not letting us take any

11     steps whatsoever, practically we've been stripped of that time

12     in between.  And so from our viewpoint today -- or the date of

13     Your Honor's ruling would be day one of postinspection period.

14             THE COURT:  Right.  And the other thing that has --

15     I'm sure the City of Freeport has not stopped doing whatever

16     it's doing from a development-approval perspective, so they may

17     have -- when this all got tied up, they may have shifted their

18     plans on where they want to build water and sewer elsewhere.  I

19     don't know -- I don't know any of that, and y'all probably don't

20     know any of that.  So at this point, who knows what may happen

21     two years from now.

22             So it does seem to me that the parties are going to

23     have to go back -- you're still married.  You need to figure out

24     a way to get along or go your separate ways, and I can't control

25     that.

1        I guess what I can do is I will enter an order that,

2   again, for the reasons stated on the record -- oh, before I do

3   that, the one last thing I would -- go ahead and interpret the

4   contract.

5        I do interpret those provisions that we talked about

6   after we came back from our break about the water and sewer not

7   being available, not closing to be in a -- in the context of a

8   situation where the trigger notice was not sent.  Because that

9   to me is the only way you can harmonize all these provisions,

10  particularly the at-risk, specific at-risk provision of the

11  money being put up after the trigger notice.  It just wouldn't

12  make any sense under this contract.

13       And because it was a critical component in my mind of

14  making this a valid contract, it would just absolutely make no

15  sense to say that that money is still refundable, again absent

16  agreement of the parties which is provided for, but if they walk

17  away because of some sewer issue at this point.

18       So that would be my interpretation, harmonization of

19  those two provisions.  So whether you call the paragraph 4

20  trumping the paragraph 5 or reading them in harmony, that's the

21  way I would read them, just so there's no confusion down the

22  road that if they walk away, they somehow get their money back

23  because I just don't see that -- if that were the case, if they

24  could walk away at any point in the future and get their money

25  back, I would have a much more favorable view of Mr. Sickler's

1    argument that -- then I would have to focus more seriously on

2    this idea that maybe the consideration for that indefinite

3    option was these studies that they might get at the end of that.

4    That would be a tougher case for me to decide, but because of

5    the way I've interpreted the contract, I don't have to decide

6    that case.

7              All right.  I'm sorry, Mr. Massey.  I think I cut you

8    off.  Anything else you think you need from me?

9              MR. MASSEY:  No, Your Honor.

10             THE COURT:  All right.  Well, what I'll do is I will

11   get an order out that -- I guess I'm effectively granting the

12   plaintiff's, the buyer's motion for summary judgment, denying

13   the cross-motion for summary judgment, issuing the declaration

14   that I said.  The contract's valid and in effect.  250,000 is at

15   risk, which means we're in the postinspection period, which

16   means $250,000 at risk.  And I think those are the only

17   declarations, and maybe that the seller has its obligations

18   under the contract.  So those couple things.

19             If you get that order from me and it raises any

20   concerns, talk amongst yourself, get a motion to me, filed, and

21   I can clarify it.  Again, I wanted to avoid having to write an

22   order over the holidays, but we're not over the holidays

23   anymore.  But I think the findings I've made on the record that

24   the parties at least understand are sufficient to resolve the

25   case, and that's what I've done.

1          All right.  And I wish you the best of luck in going

2     back to the negotiating table.  I appreciate both your time

3     today, I appreciate the arguments today, and we're adjourned.

4          *(Proceedings adjourned at 11:16 a.m.)*

5                         * * * * * * * *

6          I hereby certify that the foregoing is a true and correct
      transcript of the stenographically reported proceedings held in
7     the above-entitled matter, pursuant to the provisions of Section
      753, Title 28, United States Code.

8

9                                          3/5/25

10    _____    _____
      Julie A. Wycoff, RMR, CRR           Date
      Official U.S. Court Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25